ACCEPTED
06-15-00049-CV
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
12/14/2015 7:12:21 PM
DEBBIE AUTREY
CLERK

No. 06-15-00049-CV

In the Sixth District Court of Appeals at Texarkana, Texas

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
12/15/2015 8:24:00 AM
DEBBIE AUTREY
Clerk

**Christina Marente, Individually and as Representative of the Estate of Christian Marente, Deceased**,
Appellant

v.

**Eunice Asah and Epic Health Services, Inc.**,
Appellees

On Appeal from Cause No. 86812,
40th Judicial District Court, Ellis County, Texas
Hon. Bob Carroll, Presiding

## JOINT BRIEF OF APPELLEES

| | |
|---|---|
| David M. Walsh IV | Winston L. Borum |
| State Bar No. 00791874 | State Bar No. 02675500 |
| dmwalsh@chambleeryan.com | borum@borumhancock.com |
| Chamblee, Ryan, Kershaw & Anderson, P.C. | Borum & Hancock, L.L.P. |
| 2777 N. Stemmons Freeway | 801 Cherry Street |
| Suite 1157 | Suite 2485 |
| Dallas, Texas 75207 | Fort Worth, Texas 76102 |
| (214) 905-2003 – Phone | (817) 336-4100, ext. 1 – Phone |
| (214) 905-1213 – Fax | (817) 336-4141 – Fax |
| | |
| Counsel for Appellee | Counsel for Appellee |
| Eunice Asah | Epic Health Services, Inc. |

**Oral Argument Conditionally Requested**

## Identities of Parties and Counsel

1. Appellant Christina Marente, Individually and as Representative of the Estate of Christian Marente, Deceased

Represented in the trial court and on appeal by:

Douglas T. Floyd
3336 Therondunn Dr.
Plano, Texas 75023
(214) 704-7081 – Phone
(469) 519-9488 – Fax

2. Appellee Eunice Asah

Represented in the trial court by:

Peter H. Anderson
Kimberly K. Bocell
David M. Walsh IV
Chamblee, Ryan, Kershaw & Anderson, P.C.
2777 N. Stemmons Freeway, Suite 1157
Dallas, Texas 75207
(214) 905-2003 – Phone
(214) 905-1213 – Fax

Represented on appeal by:

David M. Walsh IV
Chamblee, Ryan, Kershaw & Anderson, P.C.
2777 N. Stemmons Freeway, Suite 1157
Dallas, Texas 75207
(214) 905-2003 – Phone
(214) 905-1213 – Fax

3. Appellee Epic Health Services, Inc.

Represented in the trial court and on appeal by:

2

Winston L. Borum
Borum & Hancock, L.L.P.
801 Cherry Street
Suite 2485
Fort Worth, Texas 76102
(817) 336-4100, ext. 1 – Phone
(817) 336-4141 – Fax

# Table of Contents

Identities of Parties and Counsel   2

Index of Authorities   8

Statement of the Case   14

Statement Regarding Oral Argument   15

Issues Presented   15

Introduction   16

Statement of Facts   19

A.   The Medical Events   19

B.   The Lawsuit   23

Summary of the Argument   26

Argument   27

A.   The abuse of discretion standard applies   27
to this case

B.   The trial court did not abuse its discretion   29
in finding neither expert qualified

1. Chapter 74 requires qualified experts   29

a. Chapter 74 provides detailed rules   30
for one to qualify as an expert against
a health care provider

b. Judicial interpretations of the statute require "expertise" on the subject matter of the case ............ 33

c. The statutory requirements require a limited view of the qualifications issue ............ 44

2. Marable never explained any knowledge base that qualified him to offer opinions about tracheostomy nursing care in a home-health setting ............ 47

    a. Marable's CV did not demonstrate he was qualified ............ 48

    b. Marable's first report did not show he was qualified ............ 48

    c. Marable's amended report showed no experience with the subject matter at hand ............ 53

3. Bingham never explained what qualifications she had to offer opinions about nursing care in a home-health setting ............ 59

    a. Bingham's first report and CV did not demonstrate qualifications for this case ............ 59

    b. Bingham's second report and CV do not show she was qualified ............ 62

    c. Bingham's third report and CV do not establish that she is qualified ............ 69

4. The experts' claim that Marente said that changing the tracheostomy tube was not Nurse Asah's responsibility does not render the experts qualified ... 72

5. Marable was not qualified to offer opinions about Epic's potential direct liability ... 77

C. While Marente did not need a separate expert on the issue of the vicarious liability issue, she still needed to have a qualified expert report for Nurse Asah's conduct in order for the vicarious liability claim to proceed; because Marente had no qualified expert regarding Nurse Asah, the vicarious liability claim against Epic failed ... 80

D. The trial court did not abuse its discretion by finding the experts were not qualified and dismissing Marent's claims ... 82

E. Marent's other arguments about the sufficiency of the reports on the statutory elements are irrelevant ... 84

Prayer ... 87

Certificate of Service ... 89

Certificate of Compliance ... 89

Appendix

1. Order on Defendants Eunice Asah's and Epic Health Services, Inc.'s Objections to Plaintiff's Amended Chapter 7 Expert Reports and Motions to Dismiss
2. Curriculum Vitae of Charles Marable, M.D.
3. Amended Expert Report of Charles Marable, M.D.
4. Curriculum Vitae of Patti Bingham, R.N.
5. Amended Expert Report of Patti Bingham, R.N.
6. Tex. Civ. Prac. & Rem. Code § 74.402

# Index of Authorities

Cases

*Adeyemi v. Guerrero,*                                    42
    329 S.W.3d 241 (Tex.App.—Dallas 2010, no pet.)

*Am. Transitional Care Ctrs. of Tex. v. Palacios,*      27-28
    46 S.W.3d 873 (Tex.2001)

*Arlington Mem'l Hosp. v. Baird,*
    991 S.W.2d 918 (Tex.App.—Ft. Worth 1999,             62
    pet. denied)

*Bowie Mem'l Hosp. v Wright,*                          19, 28-29
    79 S.W.3d 48 (Tex. 2002)

*Broders v. Heise,*                                     passim
    924 S.W.2d 148 (Tex. 1996)

*Carreras v. Trevino,*                                   40
    298 S.W.3d 721 (Tex.App.—Corpus
    Christi-Edinburg 2009, no pet.)

*Certified EMS, Inc. v. Potts,*                          81
    392 S.W.3d 625 (Tex. 2013)

*Chester v. El-Ashram,*                                  37
    228 S.W.3d 909 (Tex.App.—Dallas 2007, no pet.)

*Chisholm v. Maron,*                                     85
    63 S.W.3d 903 (Tex.App.—Amarillo 2001, no pet.)

*Christus Health Ark-La-Tex v. Curtis,*                  28
    412 S.W.3d 44 (Tex.App.—Texarkana 2013, pet.
    denied)

*Coastal Oil & Gas Corp. v. Garza Energy Trust,*         63
    268 S.W.3d 1 (Tex. 2008)

*Davisson v. Nicholson,*
310 S.W.3d 5435 (Tex.App.—Ft. Worth 2010, no pet) ........ 33

*E.I. du Pont de Nemours & Co. v. Robinson,* ........ 34
923 S.W.2d 549 (Tex. 1995)

*FFE Transp. Servs., Inc. v. Fulgham,* ........ 73
154 S.W.3d 84 (Tex. 2004)

*Forrest v. Danielson,* ........ 39
77 S.W.3d 842 (Tex.App.—Tyler 2002, no pet.)

*Foster v. Zavala,* ........ 40
214 S.W.3d 106 (Tex.App.—Eastland 2006, pet. denied)

*Ganske v. Spence,* ........ 28
129 S.W.3d 701 (Tex.App.—Waco 2004, no pet.)

*Group v. Vicento,* ........ 42
164 S.W.3d 724 (Tex.App.—Houston [14th Dist.] 2005, pet. denied)

*Helena Chem. Co. v. Wilkins,* ........ 33
47 S.W.3d 486 (Tex. 2001)

*Hendrick Med. Ctr. v. Conger,* ........ 40, 84
298 S.W.3d 784 (Tex.App.—Eastland 2009, no pet.)

*Hollingsworth v. Springs,* ........ 29
353 S.W.3d 506 (Tex.App.—Dallas 2011, no pet.)

*HN Tex. Properties, L.P. v. Cox,* ........ 40
No. 02-09-00111-CV, 2009 WL 3337190 *3-*4 (Tex.App.—Ft. Worth 2009, no pet.)

9

*Jones v. King,* 73
    255 S.W.3d 156 (Tex.App.—San Antonio 2008,
    pet. denied)

*Kerr-McGee Corp. v. Helton,* 63
    133 S.W.3d 245 (Tex. 2004)

*Larson v. Downing,* 34
    197 S.W.3d 303 (Tex. 2006)

*Loaisiga v. Cerda,* 86
    379 S.W.3d 248 (Tex. 2012)

*Mangin v. Wendt,* 40
    No. 01-14-00852-CV, 2015 WL 6830198 *4-*6
    (Tex.App.—Houston [1st Dist.] 2015, no pet. h.)

*In re McAllen Med. Ctr., Inc.,* 40
    275 S.W.3d 458 (Tex. 2008)

*Methodist Hosp. v. Shepherd-Sherman,* 34
    296 S.W.3d 193 (Tex. App.—Houston [14th Dist.]
    2009, no pet.)

*Obstetrical & Gynecological Assocs., P.A. v. McCoy,* 80
    283 S.W.3d 96 (Tex.App.—Houston [14th Dist.]
    2009, pet. denied)

*Olveda v. Sepulveda,* 38
    141 S.W.3d 679 (Tex.App.—San Antonio 2004,
    pet. denied)

*Packard v. Guerra,* 74-75
    252 S.W.3d 5112 (Tex.App.—Houston [14th Dist.]
    2008, pet. denied)

*Perry v.* Bradley, 33, 36, 83
    No 10-10-00402, 2011 WL 6415135 *3n.1
    (Tex.App.—Waco 2011, no pet.)

*Reed v. Granbury Hosp. Corp.*,                                    33, 39
    117 S.W.3d 404 (Tex.App.—Ft. Worth 2003, no pet.)

*Salais v. Tex. Dept. of Aging and Disability Servs.*,            28
    323 S.W.3d 527 (Tex.App.—Waco 2010, pet. denied)

*Samlowski v. Wooten*,                                             29
    332 S.W.3d 404 (Tex. 2011)

*In re Samonte*,                                                   41, 83
    163 S.W.3d 229 (Tex.App.—El Paso 2005)
    (orig. proceeding)

*Stephanie M. Phillipp, P.A. v. McCreedy*,                        19
    298 S.W.3d 682 (Tex.App.—San Antonio 2009, no pet.)

*Tenet Hosp. Ltd. v. Love*,                                        40
    347 S.W.3d 743 (Tex.App.—El Paso, no pet.)

*Thomas v. Alford*,                                                34
    230 S.W.3d 853, 857 (Tex.App.—Houston [14th Dist.]
    2007, no pet.)

*Tomasi v. Liao*,                                                  39
    63 S.W.3d 62 (Tex.App.—San Antonio 2001, no pet.)

*Van Ness v. ETMC First Physicians*,                              82
    461 S.W.3d 140 (Tex. 2015)

*Weisgram v. Marley Co.*,                                          62-63
    528 U.S. 440 (2000)

*In re Windisch*,                                                  34, 41
    138 S.W.3d 507 (Tex.App.—Amarillo 2004, no pet.)

*Yamada v. Friend*,                                                86
    335 S.W.3d 192 (Tex. 2010)

Statutes

Tex. Civ. Prac. & Rem. Code § 74.351(a)      17

Tex. Civ. Prac. & Rem. Code § 74.351(c)      86

Tex. Civ. Prac. & Rem. Code § 74.351(r)(5)(B)      30

Tex. Civ. Prac. & Rem. Code § 74.351(r)(6)      30

Tex. Civ. Prac. & Rem. Code § 74.351(s)      20

Tex. Civ. Prac. & Rem. Code § 74.401      32

Tex. Civ. Prac. & Rem. Code § 74.402      32

Tex. Civ. Prac. & Rem. Code § 74.402(b)      31, 56

Tex. Civ. Prac. & Rem. Code § 74.402(b)(1)      33, 45

Tex. Civ. Prac. & Rem. Code § 74.402(c)      31

Tex. Civ. Prac. & Rem. Code § 74.402(d)      31, 74

Tex. Civ. Prac. & Rem. Code § 74.403(a)      62

Tex. Occ. Code § 301.002(2)      61

Tex. Occ. Code § 301.002(5)      61

Tex. Rev. Civ. Stat. Art. 4590i § 14.01(a)      32, 33

Tex. Rev. Civ. Stat. Art. 4590i § 14.01(a)(1)      33-34

Tex. Rev. Civ. Stat. Art. 4590i § 14.01(c)      32

Tex. R. App. P. 38.2(a)(1)(B)      20

Tex. R. App. P. 41.3      28 n.2

Miscellaneous

W. Wendell Hall, *Standards of Review in Texas*,        29
    38 St. Mary's L. J. 47, 62 (2006)

https://www.nlm.nih.gov/medlineplus/ency/article/002955.htm     29 n.1

## Statement of the Case

| | |
|---|---|
| Nature of the Case: | This health care liability claim arises out of nursing care that Eunice Asah, R.N. provided to Christian Marente in a home-health setting. CR 8, 17, 43-44, 50, 64, 74, 266-267, 308-309, 326, 328, 332, 351-352, 354 (all discussing the fact that Nurse Asah cared for Christian in his home). Nurse Asah was employed by Epic Health Services, Inc. *See* CR 17. |
| Course of the Proceedings: | Marente sued and initially served only a nursing expert report in her effort to comply with the Chapter 74 preliminary expert report requirement; Defendants objected to that nurse's qualifications. CR 7-15; 40-56. Marente then served the report of a neurologist; Defendants again objected. CR 57-163. After Marente responded and argued that the experts were qualified, the trial court found the reports were deficient and granted Marente a 30-day extension to cure the deficiencies. CR 193-196. Marente served "amended" reports from the nurse and neurologist; Defendants again objected. CR 197-306. |
| Trial Court's Disposition: | After hearing from the parties and extensive post-argument briefing, the trial court found that the nurse and neurologist were not qualified and dismissed the case with prejudice and awarded attorneys' fees and costs. CR 307-359; 368; 379-385. This appeal followed. CR 395. |

## Statement Regarding Oral Argument

Appellees believe that this case can be decided without oral argument. The central issue in the case is whether Marente's nursing and neurology experts were qualified to offer opinions about Nurse Asah's care in a home-health setting. Under the abuse of discretion standard of review that applies to cases like this one, that determination can easily be made by reviewing paperwork – the reports and curricula vitae of the purported experts. Argument should not be helpful in (a) determining qualifications and (b) determining whether the trial court's qualifications ruling amounted to an abuse of discretion. Despite the belief that this Court can decide this case without argument, Appellees conditionally requested oral argument to preserve their right to argue should this Court determine that argument would assist the resolution of the case.

## Issues Presented

Issue 1 (Responsive to Appellant's Issues 1 and 2): In order to be qualified under Chapter 74, an expert must have expertise in the specific subject matter at issue in the case. The subject matter here is providing home-health care to a ventilator-dependent patient whose tracheostomy tube became dislodged and how to respond to

15

an emergency in that setting. Neither expert had any experience in that practice setting or with that subject matter. Did the trial court abuse its discretion in finding the experts were not qualified and then dismissing the case?

Issue 2 (Responsive to Appellant's Issue 3): Under Chapter 74, a claimant must provide an expert report that connects the dots for one entire theory of the case to maintain a claim against a party. A theory of vicarious liability based on an employee's conduct requires a report that satisfies the Chapter 74 elements (including qualifications) for the employee's conduct. Neither report satisfied the Chapter 74 burden as to Nurse Asah. Did the trial court abuse its discretion in dismissing the claims against Epic Health Services, Inc. when no report from a qualified expert satisfied the Chapter 74 burden?

**Introduction**

It has been said that "hard facts make bad law." The temptation exists here because the case presents very sympathetic facts: Christian Marente suffered very serious pre-existing medical conditions, was ventilator-dependent, and died as a result of the displacement of his tracheostomy tube that Nurse Eunice Asah's

16

could not replace. But that a sympathetic patient died under the watch of a health care provider does not mean that the provider was negligent or even that the resulting claim had any merit. Indeed Texas law requires claimants in such health care case to serve an expert report early in the case that demonstrates the claim has merit to prevent overly sympathetic juries from reaching an incorrect conclusion based on that sympathy. Tex. Civ. Prac. & Rem. Code § 74.351(a).

The trial court – while acknowledging the obvious sympathy for Christina Marente's situation – did not succumb to the temptation to make bad law. *See* CR 371 (acknowledging that Christian's death was a tragedy and that "the sympathy of the trial court is understandably with his surviving mother"). Instead the trial court thoroughly evaluated the expert reports and case law, requested multiple rounds of briefing from the parties, and ultimately concluded that, despite the sympathy, dismissal was "the legally correct result." *Id. See also* CR 307-359 (containing the parties' post-argument briefing and the trial court's additional questions and analysis).

Marente's general arguments that the reports met the statutory requirements ignore the fact that neither expert was qualified.  And her specific argument on qualifications ignores the fact that neither expert had any experience in this particular health care setting: providing home-health nursing care to a ventilator-dependent patient when an emergency arises.  Marente's approach to qualifications is the exact opposite of the Supreme Court's requirement that experts have expertise "on the very subject matter" on which they offer opinions.  *Broders v. Heise*, 924 S.W.2d 148, 153-154 (Tex. 1996).  The trial court properly rejected Marente's arguments because the law requires more expertise than her experts demonstrated.

The deferential standard of review must be kept in mind at all times in assessing the judgment of the trial court.  An appellate court reviews a trial court's rulings on Chapter 74 expert reports as well as on expert qualifications for an abuse of discretion, i.e. the trial court must have acted arbitrarily without reference to any guiding principles or rules.  Under this standard,  the question is never whether this Court agrees with the result below, but instead whether any reasonable court could have ruled in that fashion.  With the

18

degree of deference owed to the ruling below, this Court should affirm.

Appellees are not attempting to parse nuances of medicine or be hypercritical of a fellow lawyer. Nor are they trying to make courts the "pawns in the 'little game' of expert report litigation" and the apparent development of "a cottage industry of expert-report litigation." *See Stephanie M. Phillipp, P.A. v. McCreedy*, 298 S.W.3d 682, 684 (Tex.App.—San Antonio 2009, no pet.). The expert report serves an important function: informing the defendant of the conduct called into question and demonstrating to the court that the claim has merit. *Bowie Mem'l Hosp. v Wright*, 79 S.W.3d 48, 52 (Tex. 2002). Here, serious concerns exist regarding the qualifications of the experts. Appellees and the trial court were not being hypertechnical or splitting hairs by having these concerns.

## Statement of Facts

### A. The Medical Events

As a preliminary note regarding these facts, the trial court dismissed the case at the expert report stage. Unlike a trial on the merits where the facts can be contested, the only possible sources for what occurred are the expert reports and Marente's pleading.

19

Discovery did not occur. *See* Tex. Civ. Prac. & Rem. Code § 74.351(s). Nurse Asah and Epic did not have the opportunity to create an appellate record that contained their side of the story let alone have the opportunity to prove to a jury that their side was the correct version of the facts. While the facts in this Brief must necessarily come from Marente's version of the case, Appellees do not agree with those facts and, by reciting them in this brief, do not admit that those facts are true.

With that important caveat, Nurse Asah and Epic provide this Statement of Facts because they are dissatisfied with Marente's. Tex. R. App. P. 38.2(a)(1)(B). An important component for dissatisfaction with Marente's Statement of Facts is that it appears unhelpful because it is bereft of citations to the record – with the sole exception of a single citation to a lengthy quote from the allegations contained in the First Amended Petition. Appellant's Brief, pp. 5-7.

Christian Marente had a difficult life. At age 17, important medical notes by his physician included the fact that he "was eating and drinking by mouth." CR 50. Such simple tasks should easily be within the reach of 17-year olds, but Christian was different. He suffered from Jeune syndrome and restrictive lung disease. *Id.*

20

According to Marente's own experts, Jeune syndrome – asphyxiating thoracic dystrophy – "is a rare autosomal recessive skeletal dysplasia" (a cellular abnormality affecting growth, development, and function) that is "characterized by a small, narrow chest and variable limb shortness." *Id.* With the narrow ribcage, breathing problems occur because the lungs do not "develop[] fully or expand[] when the child inhales." CR 63

Not only was Christian's condition rare, but also was the fact that he lived for 17 years because "there is considerable neonatal mortality" with his condition. CR 50. Even if one survives the neonatal period, complications abound, including kidney, liver, pancreas, and eye problems. *Id.* Christian's disease "left him with a tracheostomy[1] and mechanical-ventilator depend[ence]" in addition

_____

[1] A tracheostomy, according to Medline, is an operation to create an opening through the neck into the trachea (windpipe). A tube is usually placed through this opening to provide an airway and to remove secretions from the lungs. https://www.nlm.nih.gov/medlineplus/ency/article/002955.htm (last visited November 18, 2015). After placement, the neck would look – generally – like the following:

to having asthma and chronic kidney disease that required a transplant five years before his death. *Id.* (And even after the transplant, Christian's medical records reflect that he still suffered from "kidney failure." CR 63.) He required two liters of oxygen per minute; up to three liters at night. CR 50. The only time he was free from the ventilator "was when he was being bathed." CR 64.

Not surprising for a patient with these conditions, Christian needed round the clock nursing care. *Id.* On the day in question, Nurse Asah was Christian's home-health nurse. CR 50. She bathed Christian, which necessarily involved disconnecting him from the



ventilator. CR 64. The record is unclear as to the exact mechanism but Christian's tracheostomy tube "came out." *Compare* CR 50-51 (describing the tube coming out) *with* CR 241-242 (describing Nurse Asah removing and replacing the tube as part of cleaning Christian). Nurse Asah "made multiple attempts to place the...tube...but was unable to do so, even with a smaller tube." CR 50. *See also* CR 241-242 (describing Nurse Asah's efforts to replace the tube, including using a 5.0 tracheostomy tube). She then used a bag valve to attempt ventilation and called 911. CR 50, 242. In the end, Christian was without a pulse for a protracted period and eventually died. CR 50, 65, 242, 257.

## B. The Lawsuit

Less than a year after Christian's death, Marente (in her own capacity as well as representative of his estate) sued Nurse Asah and her employer Epic. CR 7-15. Shortly thereafter, and before either Defendant answered, she amended her pleading. CR 16-24. While she asserted claims related to malpractice, DTPA, and assault, the gravamen of her complaint related to the medical care that Nurse Asah and Epic provided to Christian. *Id.* Nurse Asah and Epic timely

answered. CR 25-39. The debate then began over the sufficiency of Marente's Chapter 74 expert reports.

Marente joined the issue by initially serving Nurse Asah with a report from Patti Bingham, R.N. in April 2013, but apparently did not serve Epic at that time. CR 40; CR 83. Within the 21 days to object, Nurse Asah objected to Bingham's qualifications. CR 43-45. In late June 2013, Marente served both Defendants with a report from neurologist Charles Marable, M.D. and a second report from Bingham. CR 57-58, 62, 73. Epic and Nurse Asah timely objected to these reports and moved to dismiss, again pointing out that neither expert was qualified among other arguments. CR 82-163, particularly CR 88-96 and 132-140. Marente separately responded. CR 164-192.

The trial court heard the objections and dismissal motions in August 2013 and concluded, in relevant part, that the reports were deficient because neither expert was qualified to express opinions on the standard of care. CR 193-194. The trial court gave Marente 30 days to cure the deficiencies in the reports. CR 194. Within that 30-day period, Marente served "amended" reports by Marable and Bingham. *See* CR 197. These reports relied on certain information

24

provided by Marente and, according to Nurse Asah and Epic, still did not establish the qualifications of either expert, resulting in a second round of objections and dismissal motions based on the qualifications issue. CR 199-265, particularly 206-216 and 225-235. Marente responded separately to each motion. CR 266-306.

The trial court heard this second round of arguments in November 2013, but the trial court's conscientious evaluation of these legal issues did not end there. CR 307. Instead, that hearing merely began the conversation between the court and the parties about the legal issues and the experts' claims about facts and included several questions by the trial court about the contours of a potential ruling. In the first wave of post-argument briefing, Defendants addressed specific issues raised during the hearing, ultimately arguing that Bingham and Marable were not qualified. CR 307-312. Marente responded; Defendants replied. CR 313-323.

A few months later, the trial court issued a letter ruling that generally found neither expert qualified on the issues in this case but requested ancillary briefing on some specific concerns about the resuscitative efforts by Nurse Asah. CR 324-330. Defendants responded, explaining why the statute required expert reports even

25

for the resuscitative efforts and that neither expert was qualified. CR 331-335. Marente responded. CR 336-346. The trial court issued another request for briefing about specific components of Marente's response, including whether the assault claim could survive without an expert report and whether it mattered whether this task of changing the tracheostomy tube was assigned to Nurse Asah. CR 347-349. Defendants and Marente responded to the trial court's questions. CR 350-359. After reviewing all the documents in the case and extensive case law, the trial court finally ruled that the experts were not qualified and granted Defendants' Motions to Dismiss. CR 368-372; 379-385. This appeal followed. CR 395.

## Summary of the Argument

For a person to qualify as an expert under the health care statute, he or she must provide the same type of care as the defendant at the time of the opinions or at the time when the defendant provided care. The person must have expertise in the very subject matter at issue in the case. Neither of Marente's experts had experience providing home-health care to a ventilator dependent patient, which was the type of care provided by Nurse Asah. Neither "expert" had expertise in the very subject matter of the case. Because

26

the experts were not qualified, Marented did not serve an expert report in the time provided by Chapter 74, mandating dismissal of her claims. The trial court did not err when it determined that Martente's experts were not qualified.

The standard of review in this case provides another reason why this Court should affirm. In order to amount to an abuse of discretion so that this Court could reverse, the trial court had to act without reference to guiding principles. The guiding principle of the statute necessitates that the so-called expert practice the same type of care. Guiding principles from case law requires that the expert have expertise in the specific subject of the case. Because the trial court acted in reference to guiding principles, any error in the trial court's evaluation of the experts' qualifications did not amount to an abuse of discretion. This Court should affirm.

## Argument

### A. The abuse of discretion standard applies to this case

The abuse of discretion standard applies to an appellate court's review of a trial court's order on a Chapter 74 motion to dismiss. *See Am. Transitional Care Ctrs. of Tex. v. Palacios,* 46 S.W.3d 873, 875 (Tex. 2001); *Christus Health Ark-La-Tex v. Curtis,* 412 S.W.3d 44, 46

27

(Tex.App.—Texarkana 2013, pet. denied); *Salais v. Tex. Dept. of Aging and Disability Servs.*, 323 S.W.3d 527, 532 (Tex.App.—Waco 2010, pet. denied).[2] The abuse of discretion standard also applies to this appeal because the issue is the experts' qualifications, which is reviewed under that standard. *Salais*, 323 S.W.3d at 531.

Under the abuse of discretion standard, an appellate court must determine if the trial court acted "arbitrarily and without reference to any guiding rules or principles." *Christus Health Ark-La-Tex*, 412 S.W.3d at 46. *See also Ganske v. Spence*, 129 S.W.3d 701, 706 (Tex.App.—Waco 2004, no pet.)(requiring an arbitrary and unreasonable decision before it amounts to an abuse of discretion). When reviewing factual matters committed to the trial court's discretion, an appellate court may not substitute its judgment for that of the trial court. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex. 2002). An appellate court cannot find an abuse of discretion "merely because a trial court may decide a matter within its

---

[2] This case appears in this Court via transfer from the Tenth District Court of Appeals at Waco pursuant to the Supreme Court's administrative order equalizing the dockets. Misc. Docket No. 15-9114 (June 23, 2015). In such cases, the Court of Appeals receiving the case "must decide the case in accordance with the precedent of the transferor court under principles of stare decisis if the transferee court's decision otherwise would have been inconsistent with the precedent of the transferor court." Tex. R. App. P. 41.3.

discretion in a different manner than [the appellate court] would in a similar circumstance." *Hollingsworth v. Springs*, 353 S.W.3d 506, 513 (Tex.App.—Dallas 2011, no pet.). Thus, this standard "insulates the trial judge's reasonable choice from appellate second guessing." *Samlowski v. Wooten*, 332 S.W.3d 404, 410 (Tex. 2011)(quoting W. Wendell Hall, *Standards of Review in Texas*, 38 St. Mary's L. J. 47, 62 (2006)).

## B. The trial court did not abuse its discretion in finding neither expert qualified

### 1. Chapter 74 requires qualified experts

Within 120 days of filing suit,[3] a health care liability claimant must serve "one or more expert reports, with a curriculum vitae of each expert listed in the report...." Tex. Civ. Prac. & Rem. Code § 74.351(a). This statute defines an "expert report" as a "report written by an expert that provides a fair summary of the expert's opinions" on the standard of care, breach, and the causal relationship between the breach and alleged injury. Tex. Civ. Prac. & Rem. Code § 74.351(r)(6).

---

[3] At the time suit was filed in the present case, the trigger for service of the report was the filing of the petition, but effective September 1, 2013, the trigger is the defendant's answer. *Compare* Acts 2005, 79th Leg., ch. 635 § 1, eff. Sept. 1, 2005 *with* H.B. 658 § 2, 83rd Leg., eff. Sept. 1, 2013.

### a. Chapter 74 provides detailed rules for one to qualify as an expert against a health care provider

Appellees have never asserted that Marable and Bingham are unqualified to provide opinions in *every* case, just that they have not shown themselves were qualified in *this* case – as was found by the trial court. The expert-report statute defines who qualifies as an expert, requiring that a person providing standard of care and breach opinions against a health care provider meet the requirements in Section 74.402 of the Texas Civil Practice & Remedies Code. Tex. Civ. Prac. & Rem. Code § 74.351(r)(5)(B). That section has stringent requirements for expert qualifications, mandating that a person qualifies as an expert "*only if* the person:

    (1)    is practicing health care in a field of practice that involves *the same type of care or treatment* as that delivered by the defendant…at the time the testimony is given or was practicing that type of health care at the time the claim arose;

    (2)    has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; *and*

    (3)    is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care."

Tex. Civ. Prac. & Rem. Code § 74.402(b)(emphasis added). Other factors that the trial court must consider are whether the person is

30

certified by a licensing agency or has substantial training or experience "in an area of health care relevant to the claim" and actively practices "in an area of health care services relevant to the claim." Tex. Civ. Prac. & Rem. Code § 74.402(c). A trial court may only depart from these standards with "good cause" and then must state the reasons "on the record." Tex. Civ. Prac. & Rem. Code § 74.402(d).

From a historical perspective, one should remember that the 2003 tort reform provisions tightened up the qualifications requirements for experts in health care liability claims. Under former Article 4590i of the Texas Revised Civil Statutes, Section 14.01 provided that an expert was qualified if he or she

> (1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;
> (2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and
> (3) is qualified on the basis of training or experience to offer an expert opinion on those accepted standards of medical care.

Tex. Rev. Civ. Stat. Art. 4590i § 14.01(a). The former statute also required a court to consider whether the expert was board certified or had substantial training or experience in an area of medical

31

practice relevant to the claim and was actively practicing medicine in rendering medical services relevant to the claim. Tex. Rev. Civ. Stat. Art. 4590i § 14.01(c).

While the two statutes have some similarity, important differences exist. First, the provision in Article 4590i pertained to experts offering criticisms against physicians and did not differentiate different between health care providers and physicians as the current statute does. *Compare* Tex. Rev. Civ. Stat. Art. 4590i § 14.01(a) *with* Tex. Civ. Prac. & Rem. Code §§ 74.401 and 74.402. Second – and perhaps more importantly here – it strengthened the requirement in the first subsection, not only requiring active practice at the time of the events or the time of the testimony but also requiring that the practice involve "**the same type of care or treatment as that delivered by the defendant**." *Compare* Tex. Rev. Civ. Stat. Art. 4590i § 14.01(a)(1) *with* Tex. Civ. Prac. & Rem. Code § 74.402(b)(1) (emphasis added).

### b. Judicial interpretations of the statute require "expertise" on the subject matter of the case

Courts interpreting Chapter 74 and the predecessor statute mandate that the qualifications be apparent from the four corners of

32

the report or the curriculum vitae of the purported expert. *Perry v. Bradley*, No 10-10-00402, 2011 WL 6415135 *3n.1 (Tex.App.—Waco 2011, no pet.); *Davisson v. Nicholson*, 310 S.W.3d 543, 550-552, 553-555 (Tex.App.—Ft. Worth 2010, no pet). A trial court has an obligation to ensure that "those who purport to be experts truly have expertise concerning the actual subject about which they are offering an opinion." *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001). General experience is insufficient to qualify as an expert in a specialized subject. *Reed v. Granbury Hosp. Corp.*, 117 S.W.3d 404, 410 (Tex.App.—Ft. Worth 2003, no pet.).

The proponent of the expert must "establish that the expert has knowledge, skill, experience, training, or education regarding *the specific issue before the court* which would qualify the expert to give an opinion on that particular subject." *Broders*, 924 S.W.2d at 153 (emphasis added, internal quotation marks omitted). Courts must scrutinize the expert's qualifications regarding the specific issue in the case in order to determine if the expert is qualified. *Methodist Hosp. v. Shepherd-Sherman*, 296 S.W.3d 193, 198 (Tex. App.—Houston [14th Dist.] 2009, no pet.); *Thomas v. Alford*, 230 S.W.3d 853, 857 (Tex.App.—Houston [14th Dist.] 2007, no pet.); *In re*

*Windisch,* 138 S.W.3d 507, 512-513 (Tex.App.—Amarillo 2004, no pet.). This scrutiny must occur because some experts are willing to offer dubious opinions "for the proper fee." *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 553 (Tex. 1995).

In *Larson v. Downing,* the Supreme Court reviewed a trial court's decision to exclude an expert due to lack of qualifications. 197 S.W.3d 303, 303-305 (Tex. 2006). The specific issue in that case that arose under Article 4590i was the purported negligence of a plastic surgeon who left a muscle entrapped when repairing an orbital blow-out fracture. *Id.* at 304. It had been 15 years since the expert had treated an orbital blow-out fracture, and the expert had never used the specific mesh that the defendant had used to repair the fracture. *Id.* The expert pointed to being licensed in several states, his board certification in plastic surgery, and a professorship in plastic surgery that ended just before the care in question. *Id.* The expert explained in his deposition that, as one advances in a plastic surgery career, he or she tends to practice cosmetic surgery because it involves fewer emergencies than general plastic surgery. *Id.* Plus there was no indication that the expert had ever taught this procedure. *Id.*

With this record, the trial court excluded the expert's testimony because the expert was not qualified. *Id.* The appellate court reversed because a qualified expert did not necessarily have to perform the same procedure and teaching was specifically included in the definition of "practicing medicine" in the predecessor statute. *Id.* The Supreme Court reversed the court of appeals, reinstating the trial court's ruling. *Id.* at 305. The Supreme Court noted that the trial court had to consider whether the expert actively practiced medicine in an area relevant to the claim and that the expert had not performed the procedure in years, which suggested that he was not actively practicing in the relevant area. *Id.* Nor did the record show that the expert taught the procedure. *Id.* Thus, "the trial court was well within its discretion" to find the expert not qualified. *Id.*

The intermediate appellate courts have reached similar conclusions, finding no abuse of discretion when an expert has not shown expertise in the subject matter. In *Perry v. Bradley*, the Waco Court of Appeals evaluated the qualifications of a pharmacy expert. No. 10-10-00402-CV, 2011 WL 6415135 (Tex.App.—Waco 2011, no pet.)(mem. op.). That case involved a retail pharmacist who allegedly filled a prescription incorrectly. The plaintiff supported the

negligence claim with two expert reports, one from a pharmacist addressing the standard of care issues and one from a physician addressing causation. *Id.* at *1.

After reciting the statutory requirements under 74.402, the appellate court noted from the pharmacist's report that he was "a licensed Texas pharmacist" with experience "as a clinical pharmacist and pharmacy school faculty member." *Id.* at *3. The report then described the routine responsibilities for pharmacists in retail or outpatient pharmacies. *Id.* But the report did not explain how the expert was knowledgeable about the standard of care in a retail setting, and the appellate court could not "infer from his training and experience that he is qualified to offer an expert opinion regarding the standard of care applicable to retail or outpatient pharmacies." *Id.* Because merely being a physician is insufficient to qualify as an expert, so too merely being a pharmacist is insufficient to qualify as a pharmacy expert. *Id.* Thus, the Waco court could not say that the trial court abused its discretion in finding the academic-pharmacy expert unqualified and dismissing the case. *Id.* at *4.

Similarly, *Chester v. El-Ashram* from the Dallas Court of Appeals evaluated whether an anesthesiologist was qualified to render

36

opinions against a pulmonologist. 228 S.W.3d 909, 913-914 (Tex.App.—Dallas 2007, no pet.). After reciting the Article 4590i requirements, the appellate court discussed the anesthesiologist's qualifications, which were essentially limited to evaluating medical conditions like the patient's to see whether the patient could undergo surgery as opposed to ordering medicine, tests, and treatment to resolve the conditions. *Id.* at 913-914. The expert had not prescribed antibiotics or intubated a patient either at the time of his testimony or the time of the treatment. *Id.* at 914. And the expert never explained how evaluating a patient for surgery qualified the expert to opine on what treatment a non-surgical patient should receive. *Id.* Thus, the appellate court concluded the trial court did not abuse its discretion by excluding the expert's testimony.

The San Antonio appellate court reached a similar result when evaluating an obstetric anesthesiologist's report that criticized the conduct of a urologist under Article 4590i. *Olveda v. Sepulveda,* 141 S.W.3d 679, 681 (Tex.App.—San Antonio 2004, pet. denied). The case involved the medical issue of preeclampsia (pregnancy-induced hypertension) in a patient who was undergoing a surgical procedure that resulted in the deaths of the fetus and a few days later the

mother. *Id.* at 680-681. The expert never stated that the diagnosis of preeclampsia was within the field of urology or that it was even developed in more than one field. *Id.* at 682-683. And the expert limited her expertise to anesthesiology and obstetrics. *Id.* at 683. The court held that, while the expert may, theoretically, have the requisite qualifications, the expert needed to show those qualifications in her report. *Id.* Without an explanation of why the expert was qualified, the appellate court affirmed the trial court's conclusion that the expert was not qualified. *Id.*

Other examples include:

- *Reed v. Granbury Hosp. Corp.*, 117 S.W.3d 404 (Tex.App.—Ft. Worth 2003, no pet.)(affirming trial court's exclusion of experts' testimony against hospital where neither expert had any experience formulating hospital policy);
- *Forrest v. Danielson*, 77 S.W.3d 842 (Tex.App.—Tyler 2002, no pet.)(affirming trial court's dismissal for deficient expert report where orthopedic surgeon did not explain how he was qualified to opine about treatment for disc protrusion); and
- *Tomasi v. Liao*, 63 S.W.3d 62 (Tex.App.—San Antonio 2001, no pet.)(affirming dismissal where trial court found that psychiatry expert provided no explanation for how his expertise translated into qualifications to criticize post-neurosurgical care).

This line of cases is instructive because it shows that a trial court's rejection of an expert's qualifications does not amount to an abuse of

38

discretion, especially where the expert does not explain how they have expertise in the relevant subject matter.

In addition to these cases, another important line exists: cases where it was held that trial courts abused their discretion by finding unqualified experts to be qualified. This second line of cases is important because it demonstrates another end of the spectrum of the expert-qualification issue: qualifications so lacking that approval by the trial court amounted to an abuse of discretion. Among these cases are those that:

- rejected the trial court's conclusion that an anesthesiologist was qualified (without further explanation) to opine about complications of a heart procedure performed by a cardiologist, *Mangin v. Wendt*, No. 01-14-00852-CV, 2015 WL 6830198 *4-*6 (Tex.App.—Houston [1st Dist.] 2015, no pet. h.);
- concluded that the trial court abused its discretion because neither proffered expert demonstrated expertise in hospital's determination of staffing needs of specialists or transfer policies, *Tenet Hosp. Ltd. v. Love*, 347 S.W.3d 743, 750-752 (Tex.App.—El Paso, no pet.);
- determined that the trial court erred by concluding that physician was qualified to criticize nursing care when the physician never explained how or why he was, *HN Tex. Properties, L.P. v. Cox*, No. 02-09-00111-CV, 2009 WL 3337190 *3-*4 (Tex.App.—Ft. Worth 2009, no pet.);
- reversed the trial court's determination that emergency room physician was qualified when the expert never provided any qualifications for the

development of hospital policies and procedures in an ICU, *Hendrick Med. Ctr. v. Conger*, 298 S.W.3d 784, 788-789 (Tex.App.—Eastland 2009, no pet.);

- determined that an interventional cardiologist had not demonstrated qualifications about operative and post-operative care for a knee replacement, *Carreras v. Trevino*, 298 S.W.3d 721, 725-726 (Tex.App.—Corpus Christi-Edinburg 2009, no pet.);

- granted mandamus relief where expert provided no qualifications in hospital credentialing to support a negligent credentialing claim, *In re McAllen Med. Ctr., Inc.*, 275 S.W.3d 458, 462-463 (Tex. 2008);

- held that cardiologist did not explain what qualifications he had to offer criticisms of podiatrist in a case involving complications from a diabetic foot, *Foster v. Zavala*, 214 S.W.3d 106, 114-116 (Tex.App.—Eastland 2006, pet. denied);

- granted mandamus relief when "anesthesia professor" never explained any qualifications to render criticisms about anesthesiologist, *In re Samonte*, 163 S.W.3d 229, 237-238 (Tex.App.—El Paso 2005)(orig. proceeding); and

- granted mandamus relief when radiologist, who appeared not to have performed neuroradiology interventional procedures for a few years before the case, did not explain how he was qualified to render opinions about an embolization procedure that caused a brain hemorrhage, *In re Windisch*, 138 S.W.3d 507, 511-514 (Tex.App.—Amarillo 2004)(orig. proceeding).

These cases demonstrate that the expert must explain how his or her qualifications lead to expertise in the subject matter of the case. Absent such an explanation, the expert is not qualified and the report is deficient.

Appellees acknowledge those cases where the trial court found the expert to be qualified and the appellate court affirmed. That result should not be surprising – especially where an explanation exists – because the standard of review is deferential to the trial court's ruling. This line is significant in evaluating Marente's Brief because it is the primary source of authority referenced by Marente. Those cases are distinguishable based on their procedural posture alone: the trial court found the expert qualified, so the standard of review was favorable to the trial court's ruling. Marente improperly relies on at least three of these cases.

In *Adeyemi v. Guerrero*, the trial court found that a neurologist was qualified to offer opinions about an obstetrician. 329 S.W.3d 241, 246-247 (Tex.App.—Dallas 2010, no pet.). The appellate court addressed the central medical issue: a headache following a fall during the postpartum period. *Id*. at 247 ("Guerrero complained of persistent headaches and vomiting after falling. Guerrero's claims focus not on her pregnancy but on her head trauma."). The neurologist had treated hundreds of patients who had developed problems after falling. He said he was familiar with the standard of care for all physicians evaluating such patients. *Id*. The expert had,

41

therefore, explained why he was qualified for the specific issue in the case, i.e. evaluating patients who had fallen, suffered head trauma, and exhibited signs of injury from the trauma. *Id.*

One of the Houston appellate courts evaluated a similar circumstance in *Group v. Vicento*, where the claimant attempted to use an anesthesiology/pain management specialist to criticize care provided by a chiropractor. 164 S.W.3d 724, 732-733 (Tex.App.— Houston [14th Dist.] 2005, pet. denied). The trial court found the expert qualified, and the appellate court affirmed. The appellate court noted that it was not necessarily the specific practice area that answered the question of qualifications, but whether the purported expert "practices health care in a field of practice that involves the same type of care or treatment" as delivered by the defendant. *Id.* at 732. Over the course of five paragraphs, the expert explained that the pain management part of his practice "overlap[ped] and intertwine[d] with chiropractic practice," which included engaging in many of the same modalities of care, using similar treatments, using similar methods of evaluation and referral to other providers, and working with and supervising chiropractors. *Id.* at 732-733. Thus, the appellate court was able to conclude that the trial court had not

abused its discretion in finding that the field of practice involved the same type of care or treatment.  *Id.*

These cases – and others like them – are distinguishable for two reasons.  First, as developed more fully below, those experts provided significantly more information about their expertise for the specific issue in the case than Marente's experts did.  Here, Dr. Marabel and Nurse Bingham did not supply sufficient information supporting their assertions of being qualified, so the trial court's decision was correct.  Second, the procedural posture of those cases is vitally distinguishable because the deferential standard of review favored the claimant's position.  The opposite exists here: the standard of review favors the trial court's ruling in favor of Appellees.

### c.    The statutory requirements require a limited view of the qualifications issue

A few final points of emphasis are warranted before addressing the purported qualifications of Marente's experts.  First, what is the appropriate focus of the issue in the case to determine qualifications?  Second, having determined the proper focus, did Marente's experts provide "the same type of care and treatment" either at the time of the events in this case or at the time of writing their opinions?

On the first point, Marente suggests a broad focus: any physician that supervises nurses and any nurse are qualified. Appellant's Brief, 11, 16-17. That broad focus ignores the realities of the specific care provided in this case and abandons the express statutory requirement that the expert practices "the same type of care or treatment" as provided by the health care provider. Tex. Civ. Prac. & Rem. Code § 74.402(b)(1). In the context of the care provided, the home-health aspect is a vitally important consideration of the type of care provided. Home-health providers work in different homes, so they are not in a fixed location like a health care worker that cares for patients in a hospital or facility-based location. The latter goes to the same facility day in and day out. The former may be at a different address not only on different days but also at several times during a particular day.

Moreover, the home-health worker does not have all of the equipment, resources, and support that a hospital or other facility-based nurse has. A code can be called in a facility with a push of a button that assembles a team of responders, with resuscitation equipment and medications, within seconds. The home-health worker, however, is on an island by herself. She has to start CPR on

44

her own, while calling 911. Then she must continue CPR while waiting for help to arrive (which took five minutes in this case). CR 51. In this case, arrangements were then made to care flight Christian to Children's Medical Center of Dallas, but care flight did not even arrive on scene until 45 minutes after Nurse Asah called 911. CR 51 (showing 911 call at 17:23) and 256 (showing AirEvac Lifeteam being with the patient at 18:11). This sequence was not at all like pushing a code-blue button in a health care facility.

Even Marable's report acknowledges that the issue here is the ability to provide care for a tracheostomy patient in a home-health setting. *See* CR 66 (describing the specific issue as Nurse Asah's qualification to care for a tracheostomy patient and immediately call 911 and provide CPR, which would not be necessary in a facility where help is available by pushing a code-blue button on the wall of the patient's room).

Indeed, the trial court, when determining the subject matter on which the experts required qualifications, rejected Marente's contention that the subject matter should be broad. The trial court determined that the subject of the case was (1) a patient with Christian's condition, (2) with a tracheostomy and ventilator

45

dependence, (3) in a home-health setting, and (4) requiring a tracheostomy-tube change. CR 326. The trial court pointed out that even Marable suggested that a key issue was tracheostomy care. CR 327. The trial court then pointed out that Marente's experts had not demonstrated qualifications in the relevant subject matter. CR 327-329.

On the second point, not only does the statute require an expert who provides "the same type of care and treatment" as the defendant, but it also mandates that the expert have those qualifications "at the time the testimony is given or was practicing that type of health care at the time the claim arose." So if the experts do not currently have this type of practice or did not have it at the time of the occurrence, they are not qualified under the statute. With this preliminary backdrop, one can now analyze the qualifications of Marente's experts Charles Marable, M.D. and Patti Bingham, R.N.

2. **Marable never explained any knowledge base that qualified him to offer opinions about tracheostomy nursing care in a home-health setting**

Marente served two reports from Marable: one before the trial court's first ruling on the sufficiency of the expert reports, and one after a 30-day extension. Both reports attached the same curriculum

46

vitae (CV). These items did not demonstrate that Marable was qualified.

### a. Marable's CV did not demonstrate he was qualified

Marable's CV demonstrates that he is a neurologist in Fort Worth with "26 years of experience." CR 71 and 265. He is on staff at several hospitals, but he is not affiliated with any home-health entities. *Id.* In fact, his CV is silent about any experience in the home-health setting, and it is not even apparent from his CV that he has ever worked with ventilator-dependent young adults. *Id.* Moreover, his CV provides no details about any supervision or instruction of nurses. *Id.*

Marable's CV reveals that he *should* be quite familiar with what Chapter 74 requires in terms of expert qualifications because his second listed "Area of Expertise" is "Medical Malpractice regarding Neurological issues." *Id.* Also, the concept of expert qualifications as required under Texas law should not be foreign to Marable because

he has given "over 700" depositions, 90% of which were for Plaintiffs. *Id.*

### b. Marable's first report did not show he was qualified

Marable's first report contains a section on his qualifications, consisting of five short paragraphs. CR 62-63. Much of the first paragraph contains boilerplate: a recitation of some of the statutory standards. CR 62. That paragraph also attempts to define the issue in this case as "anoxic encephalopathy," which defines the end-point, i.e. what injury Christian suffered, instead of the type of care that Nurse Asah provided, i.e. home-health care of a ventilator-dependent patient. *Id.* But even Marable's discussion of anoxic encephalopathy only describes the fact that he has treated such patients during his practice. *Id.* This paragraph contains no explanation of how that experience qualifies him to establish standards of care and offer criticisms of a home-health nurse caring for a ventilator-dependent patient. *Id.* Likewise, the second paragraph describes the fact that neurologists are consulted for anoxic encephalopathy events and perform brain death examinations, which says nothing at all about

qualifications to provide standard of care or breach of standard of care opinions in this case.  *Id.*

The third paragraph finally says something about a ventilator, but it is ultimately not very illuminating about the type of care at issue in this case. CR 63.  Marable explains that neurologists (among some other specialists) handle ventilator settings "in the ICU."  *Id.* But that experience is not at all helpful to establish his qualifications in this case. No one is complaining that the ventilator settings were incorrect or improperly adjusted, causing damage to Christian. Indeed, Christian was not on the ventilator at the time this crisis occurred because he had been bathed (off ventilator) and the tracheostomy tube came out or was being changed.  CR 50-51, 64, 74, 241-242, and 255-256.  That a person has experience with the settings of a mechanical ventilator  does not mean that he is qualified to say what a home-health care nurse is required to do when a tracheostomy tube comes out or when a tracheostomy tube needs changing.   Moreover, his purported experience occurred in an intensive care unit, i.e. in an extremely controlled setting in a hospital, not in a home-health setting.  CR 63.  In short, Marable's claimed experience with ventilator settings in a hospital does nothing

49

to show that he has qualifications on the very subject matters in this case, a home-health event with a tracheostomy tube becoming displaced or being changed.

The fourth paragraph merely states that he treats "neurological cases" that involve children as young as 13 or 14, implying that Christian's care would fall within his realm.[4] *Id.* Neurology involves a wide field and includes a host of problems that have nothing to do with Christian's condition or being ventilator dependent. While the report suggests qualifications that may cover Christian's care, Marable fails to establish that he has treated pediatric neurological cases remotely similar to Christian's: a ventilator-dependent patient requiring round-the-clock nursing care in a home-health setting.

The last paragraph is where Marable describes his purported qualifications to render opinions about the standard of care for nurses. *Id.* That paragraph is almost a qualifications tautology: any

---

[4] Dr. Marable's signature line in both reports suggest that the young are not any focus of his practice. CR 263. The signature lines note that Dr. Marable is board certified in neurology and *geriatric* medicine. *Id.* If he truly treated pediatric patients, one would expect sub-specialization in pediatrics or pediatric neurology instead of going the opposite direction with certification in the care of the elderly.

doctor should be allowed to say what home-health nurses should be trained to do just because he is a doctor. Marable stated:

> …I still have the qualifications of being able to ascertain when a nurse should have adequate qualifications to treat certain illnesses. And in this case, Nurse Asah should have had the minimal requirements to provide home health nursing care and experience in treating oxygen ventilator dependent pediatric patients, as well as being able to know how to change a patient's tracheostomy tube in a home health setting, as well as responding to emergency situations as what occurred in this case. This is basic information that any doctor should be able to discuss.

*Id.* Missing from this discussion is *how or why* Marable is qualified in this regard. In its essence, this paragraph only describes what qualifications a home-health nurse with a ventilator-dependent patient should have. The paragraph does not explain Marable's education, training, or experience in dealing with nurses in this setting or why he qualifies as an expert on this topic.

Because the report is read as a whole and not just limited to the qualifications section, Marable says one more thing about his qualifications to render nursing opinions. He claims that he "had extensive training with nurses" during his residency, post-residency, and in hospitals as well as having given lectures to nurses and "dealt with home-health nurses" in his practice. CR 66. But Marable's

51

claim does not explain how these "interactions" with nurses – even home-health nurses – qualify him to know the standard of care required for a home-health nurse caring for a patient like Christian. He never claimed to be trained in tracheostomy-tube changes or in-home emergencies, to have lectured nurses on those subjects, or even to have interacted with them on those subjects.

One should not be surprised that the trial court found Marable's report deficient. He never demonstrated any experience

- dealing with the situation where a tracheostomy tube came out and could not be replaced;

- dealing with tracheostomy tube changes; and

- dealing with similar emergencies that could arise in a home-health setting.

In short, Marable never explained that he practiced in a medical field that involved the "same type of care or treatment" provided by Nurse Asah.

### c. Marable's amended report showed no experience with the subject matter at hand

Marable's "amended" report provides no further details that qualify him as an expert in the subject matter of the case. The

qualifications section is quite similar to the first report, but the last two paragraphs are different. Because the first few paragraphs are the same as the first report, the problems with those paragraphs will not be repeated. The change in the qualifications section deals with Marable's specific claim of interaction with home-health nurses. But vague interactions with home-health nurses does not mean that Marable has practice experience with the issues in this case, and his changes to the qualifications section did not correct the qualifications deficiency.

Additionally, mere interaction with another person is not (and should not be) sufficient to confer expertise. A homeowner may interact frequently with a plumber, but no court would let the homeowner testify as an expert witness on plumbing issues based on those interactions alone. That approach would also allow any licensed person to be qualified based on interactions. The reality is that Marable is just providing anecdotal experience, which does not qualify him to sit in judgment of the standards by which home-health professionals should conduct themselves. The trial court appropriately rejected that "I'm-qualified-because-I-interact" standard.

In the second to last paragraph (which is really a new paragraph in the qualifications section), Marable explains that he refers patients for home-health care and therefore has to write orders for home-based care. CR 254. He has to follow-up to see that the nurses provide the prescribed care. *Id.* While that activity may be common in his office practice, Marable never explains what type of care he prescribes to his home-health patients. Indeed as a neurologist, his patient population in the home-health setting easily could suffer from neurological complaints that have nothing to do with ventilators, tracheostomies, or emergencies in that setting. Without further explanation of what he orders the home-health nurses to do and without any explanation of what follow-up he provides, this paragraph provides no insight about how or why Marable is qualified on the issues in this case.

One final point about this paragraph, which amounts to little more Marable's assertion of qualifications due to the fact that he issues orders. When one looks to the criticisms rendered by Marable (and Bingham for that matter), none deal with how Nurse Asah carried out a physician's order. *See* CR 258 (containing Marable's description of the standard of care for dealing with airway

obstruction, tracheostomy tube replacement, and the ensuing emergency). Instead, the criticisms address how she responded to an emergency, and whether she should have changed the tracheostomy tube according to Marente's claims about her job responsibilities, etc. CR 258-259. No one mentions any physician's order on any of these subjects. Marable's claim of qualification from giving orders to home-health nurses does not even square with the criticisms that he provides. If giving orders qualified a physician to offer nursing standard of care opinions, then every physician would be qualified in every aspect of every field of nursing care without further inquiry. We know that is not the case: the statute and attendant case law say otherwise. Tex. Civ. Prac. & Rem. Code § 74.402(b); *Broders*, 924 S.W.2d at 153-154.

The last part from the qualification section attempts to rework the paragraph where Marable says that he is qualified because a doctor is qualified to know what a nurse should be able to do. As with the first report, this version is little more than Marable claiming that "I-am-qualified-because-I-say-I-am," and not actually explaining how his interactions gave him relevant experience in the subject. The re-tweaked paragraph now says:

...because of my experience since 1986 in referring patients for home health care and working with nurses that provide home health care for my patients, I am qualified to ascertain when a nurse should have adequate qualifications to treat certain illnesses in the home care environment. I am qualified to state the standard of care for a nurse treating Christian Marente and opine on the breach of the standard of care. My experience and training in working with health care institutions such as Epic Health Services, Inc., qualify me to render an opinion as to the standard of care for such institutions and opine on the breach of the standard of care.

CR 254.

The essence of the first sentence is that because Marable interacts with home-health nurses generally, he claims to be qualified to offer opinions in this specific case. That "I-deal-with-home-health-nurses-and-therefore-am-qualified" argument has already been addressed. Marable never explained that he interacts with home-health nurses on any of the subject matters in this lawsuit. The last two sentences are conclusory, merely claiming to be qualified because he says he is, instead of explaining how he is actually qualified.

As with the qualifications section, Marable also tinkered with the one other paragraph in the report that addresses qualifications. To that paragraph, he adds that he has had nurses in his office, "and

any doctor expects a nurse to be competent enough to fulfill certain duties as indicated by her education and training." CR 259. That addition, like the previous incarnation of the paragraph, says nothing about what knowledge or experience Marable has with the particular health care issue of this case, i.e. home-health care to a ventilator-dependent patient. Moreover, interacting with nurses in his office is not at all like interacting with them when they are alone in a patient's home. He fails to establish anything occurring in his office that is akin to providing tracheostomy care in a home. The addition adds nothing to Marable's qualifications.

Regardless, nothing in the revamped qualifications discussion actually answers the question called for by the statute: does Marable's practice provide "the same type of care or treatment" as Nurse Asah? The reports, on their face, suggest that Marable does not provide "the same type of care or treatment" because, at best, he orders others to provide that care, which assumes that his home-health interactions even deal with ventilator-dependent patients like Christian that require tracheostomy tube changes in a home-health setting. Moreover, he never says that he orders the type of care for

his home-health patients that is at issue in this case. The trial court did not abuse its discretion by ruling that Marable was not qualified.

**3. Bingham never explained what qualifications she had to offer opinions about nursing care in a home-health setting**

Like Marable, Bingham did little to explain how she was qualified to render opinions about the care provided to Christian in a home-health setting. The issue of Bingham's qualifications was something of a moving target in the trial court, because she provided three reports and a different CV with each report. In the end, she never explains how she has provided the same type of care "at the time" of her report or "at the time" of Nurse Asah's care. The trial court did not abuse its discretion in ruling that she was not qualified.

**a. Bingham's first report and CV did not demonstrate qualifications for this case**

Bingham, like Marable, is quite familiar with the litigation process. She has worked since 2009 as an "Independent Legal Nurse Consultant," so one would expect her to understand the importance of showing that she has expertise in the relevant subject matter. CR 54. That makes her qualifications omissions even more telling.

58

Beginning with the first CV, Bingham – at the time of the events in question and her report – worked as a weekend nurse supervisor at a nursing a rehabilitation center in Victoria. *Id.* At that time, she was also a legal nurse consultant and advised on Medicare issues (set asides, audits, and appeals). *Id.* No description of her responsibilities in her CV at the time of the events or her report showed that she had "at the time" experience with tracheostomy care in a home-health setting. *Id.*

Indeed, the only mention of something remotely touching on home-health care is her work with a hospice facility from 2003 to 2008. CR 54-55. But even that description, comprising nearly one-half of a page, never mentions care that is remotely similar to what Nurse Asah provided to Christian. *Id.* All of the care, with the possible exception of hospice care, was at a health care facility instead of a home-health setting. CR 54-56.

Even hospice care is not similar to home-health care in an emergent setting like that faced by Nurse Asah. In hospice care, the patient has a do not resuscitate order, and the providers make the patient as comfortable as possible as the patient approaches death. Thus, with a hospice patient, the emergency in this case (the inability

59

to re-place the tube in the airway) would not be handled in the same fashion in hospice because the patient chooses not to undergo such heroic measures. Caring for a hospice patient, even in a home setting, is not similar to the care provided by Nurse Asah in this setting and certainly does not amount to the "same type of care."

The first report provides no further details, essentially saying that she is a qualified nurse in a conclusory fashion. Bingham specifically stated that she "remain[s] in practice as a Registered Nurse in the state of Texas. I thus attest that I am familiar with the standard of care in Texas under the same or similar circumstances of the matter of Christian Marente." CR 49. She never explains what experience she has as a nurse that would constitute relevant expertise in this case. Such a conclusory statement is not sufficient to show that she was qualified as an expert in this case.

The fact that Bingham opines on causation further demonstrates that her claim of qualifications rings hollow. She presumes herself to be qualified on causation despite the fact that she is prohibited from doing so by the Nurse Practice Act, Chapter 74, and case law. Tex. Occ. Code § 301.002(2) and (5)(excluding medical diagnoses from the definition of professional and vocational

nursing); Tex. Civ. Prac. & Rem. Code § 74.403(a)(requiring a causation expert be a physician except in limited circumstances not applicable here); *Arlington Mem'l Hosp. v. Baird*, 991 S.W.2d 918, 921 (Tex.App.—Ft. Worth 1999, pet. denied)(excluding nursing opinions on medical causation because nurses cannot be qualified on that topic).

### b. Bingham's second report and CV do not show she was qualified

One important fact in considering the revisions to Bingham's report and CV at this stage of the case was the fact that Nurse Asah had already objected to Bingham's qualifications because the care at issue involved tracheostomy care in a home-health setting. CR 43-44. When responding to such objections, one would put in *all* the requisite experience that the person had – especially a legal nurse consultant, who should be familiar with the expert-qualifications. Omission of important facts that support an expert's qualifications could doom the expert's ability to render opinions in the case, especially because the exacting standards for admission of expert testimony have been known for twenty years. *See Weisgram v. Marley Co.*, 528 U.S. 440, 445 (2000)(suggesting that, in light of the exacting

standards for experts, no party would put less than the best foot forward on the first try so that a remand for a second bite to get the issue right should be denied); *Kerr-McGee Corp. v. Helton*, 133 S.W.3d 245, 259-260 (Tex. 2004)(same) *overruled on other grounds Coastal Oil & Gas Corp. v. Garza Energy Trust*, 268 S.W.3d 1, 18-19 (Tex. 2008). As we shall shortly see, Bingham's qualifications continued to evolve with the third version of her report and CV, suggesting that maybe her claimed qualifications should be more carefully scrutinized.

The second version of the report and CV do not provide details regarding any tracheostomy care at the time of the events in question or her report. Bingham's second CV is similar in format, abbreviating the description of her current work at the nursing home and still working with Medicare issues. CR 78. The CV is silent about tracheostomy care with her current work. *Id.* Indeed tracheostomy care is only mentioned two times, and both are remote from the events of this case. *Id.* She added that she provided tracheostomy care from 2003 to 2008 as part of her hospice work without reference to a home-health setting. CR 79. That work is distant from the events of this case, from a factual and testimonial perspective. That

addition does not make Bingham qualified because it was not "at the time" of her report or Nurse Asah's care.

The second reference to tracheostomy care relates to work that Bingham performed from 1993 to 1998 for Matagorda General Hospital. Harkening back to her first CV, she described that work as being an operating room staff nurse and a trauma coordinator/case manager – with appropriate descriptions for those job titles, none of which included tracheostomy care or home-health care. CR 55-56. The second CV adds a section between operating room nurse and trauma coordinator, where she had duties with Matagorda Home Health Agency that purportedly included tracheostomy care. CR 80. Again, the recent addition might have suggested to the trial court that this change may not be truly reflective of her work experience. In any event, whatever she did for Matagorda General Hospital back in the 1990s and its home-health unit is in the distant past and cannot count as being "at the time" of the events of this case or "at the time" she gave her opinions in this case. Thus, this remote line item in her CV does not make Bingham qualified.

The second report, like the second CV, does not show that Bingham was qualified. Bingham describes that she has been

licensed as a nurse in Texas for 20 years, working in "both the emergency room and operating room at various hospitals in Texas." CR 74. She has certifications in life support and asserts that she is qualified to care for patients of all ages. *Id.* But she does not explain how those certifications and experience are relevant to the health care focus in this case. Instead of describing work in emergent situations for patients in a home, Bingham describes an anecdotal event where she had to perform CPR on her own mother. *Id.* Then she explains that she provided tracheostomy care when she worked as a hospice nurse, which, according to her CV, traces to her job from 2003 to 2008. *Id.* and CR 79.

Finally, without explanation, Bingham claims that home-health care for Christian was the same as the care she provided in hospice. CR 74. On its face, caring for a dying patient with a do-not-resuscitate order is different than caring for a patient where resuscitation will occur, so Bingham needed to explain further her claim of similarity. In any event, her hospice care was remote and cannot amount to experience being "at the time" of Nurse Asah's care or Bingham's opinions.

64

### c. Bingham's third report and CV do not establish that she is qualified

Marente finally provided an "amended" report and CV of Bingham. But those items, like the ones preceding them, did not show that she was qualified. Starting with the third CV, one difference is that for Bingham's present job in the rehabilitation and healthcare center, she has gone back to describing her duties, which remarkably for the first time includes mention of the fact that she provides tracheostomy care. CR 248. Why she failed to mention that aspect of her job in the first or second versions of her CVs and reports was never explained.

While there may be some tracheostomy care at this nursing home, two problems exist with her job description. First, she still does not tie that care to the time of the events in this case or to the time of her opinions, instead simply saying that it occurred at some point during her tenure. Second, and perhaps more importantly, that tracheostomy care was facility-based, which is a far cry from events occurring in a home-health setting. Other providers and equipment are on hand; the code button is just a reach away to bring immediate assistance and a crash cart full of resuscitation supplies.

Home-health care in this context is very different than facility-based care. *See* CR 332-333 (discussing why the home-health events are not remotely akin to an event occurring in a hospital). Any other tracheostomy care is remote or facility-based, rendering that experience inapplicable to this setting.

Turning to Bingham's report: her opening "I'm a nurse and therefore qualified" statement and then her "I'm qualified because I performed CPR on my mother in a house" statement has finally evolved to a several paragraph discussion. CR 240. Even this ramped up version fails to show that Bingham is qualified to render opinions in this case. The first paragraph describes her license, certifications, and years of practice. That discussion contains no description of tracheostomy care or home-health care, and certainly not tracheostomy care in a home-health setting. It is also worth pointing out that her own description of her experience is "work[ing] in both the emergency room and operating room at various hospitals in Texas." *Id.* If she truly had the type of experience that she claims in the subsequent paragraphs, then why emphasize an emergency room and operating room nursing practice in this paragraph?

66

In the second qualifications paragraph, Bingham describes her work at the rehabilitation and healthcare center. *Id.* In that capacity, she works in a facility that provides "24-hour skilled nursing care, including intravenous [IV] therapy with antibiotics, TPN administration, and diabetic therapy." *Id.* Missing from this description is tracheostomy care. *Id.* She then describes how she supervises various personnel on the weekends, which includes adequate staffing and assessing the patients' needs. *Id.*

This paragraph ends with Bingham's description of duties that involve monitoring patients for respiratory distress and that she has – *in the past* – provided tracheostomy care – without specifying the when this type of care is supposed to have occurred. *Id.* In fact, Bingham admits that this facility does not have any such patients currently. *Id.* That concession means that "at the time" she gave her opinions, she was not then performing that type of care. The failure to identify when she provided that care also means that the report does not state that she provided that care "at the time" Nurse Asah cared for Christian. Thus, even these statements cannot satisfy the "at the time" requirement of the statute.

67

She then says, without explanation, that she is familiar generally with the standard of care for tracheostomies (yet still without linking that "familiarity" to the home-health setting). *Id.* The statutory requirements of Chapter 74, however, require much more than a conclusory statement of qualifications. That type of conclusory statement cannot be allowed to eliminate the trial court's role in determining an expert's qualification. Experts cannot be qualified merely on their own say-so.

This say-so problem extends to the three numbered paragraphs that attempt to isolate the statutory requirements. *Id.* Bingham never explains how or why she is qualified, and instead just insists that she is qualified. For example, in the first numbered paragraph, she claims to have practiced "in the health care field of a registered nurse that involved the same type of care or treatment that Nurse Asah delivered to Christian…" *Id.* On the contrary, her report and CV reveal that she has never rendered the same type of care – she has no experience providing tracheostomy care to a young adult (who is not a no-code patient) in a home-health setting. With the exception of hospice care, all of her late-found tracheostomy care occurred in a facility that is markedly different than the home-health setting. And

the hospice care that purportedly occurred in homes was remote in time to this case and involved patients that had do-not-resuscitate orders. The other numbered paragraphs suffer from the same problem: Bingham merely says she is qualified without providing the required supporting explanation.

One last point regarding the numbered paragraphs: Bingham purports to define the type of care or the accepted standards of care "below." But the description of the type of care below shows that Bingham did not provide that "same type of care" at the time required by the statute. She goes on to state that the setting of a home-health setting made no difference. CR 243. That argument ignores the significant differences that exist between facility-based and home-based care, differences that the trial court, appropriately exercising its discretion, considered to be important in deciding what qualifications the experts needed. CR 326. Moreover, the fact that Bingham described standards of care later in her report, *see* CR 243, did not mean, by virtue of that fact alone, that she was qualified to render those opinions. The references to other parts of the report do not correct the deficiencies in Bingham's qualifications.

In Marente's Brief, she argues that "Bingham has more qualifications and experience as a registered nurse than Nurse Asah" and that her experience shows she knows the standard of care – without record citation. Appellant's Amended Brief, 14. This argument is specious, at least in part, because Nurse Asah's qualifications are not even in the record at this preliminary stage. The argument is also specious because it assumes that merely being a nurse establishes standard of care expertise in every nursing field and scenario. As discussed, Bingham did not establish that she provided "the same type of care" as Nurse Asah – either "at the time" of Nurse Asah's care or at the time of Bingham's opinions. That claim of expertise, based on a lengthy career, does not prove knowledge of any particular subject matter and was rejected by the Supreme Court in *Broders.* 924 S.W.2d at 153-154. As such, Marente's claim of greater qualifications cannot stand.

Marente also argues in her Brief that Bingham recites the correct standard of care and breaches, suggesting that she must therefore be qualified. Appellant's Brief, 14-15. But that argument puts the cart before the horse. The only way to know that she correctly recited the standard of care and attendant breaches is for

her to be a qualified witness. She failed to demonstrate that expertise, and the trial court properly rejected that argument.

### 4. The experts' claim that Marente said that changing the tracheostomy tube was not Nurse Asah's responsibility does not render the experts qualified

In their amended reports, Marable and Bingham note that a signed statement of the mother (Appellant) furnished to them claims that changing the tracheostomy tube was not Nurse Asah's responsibility. CR 242, 259. But even if that allegation were true as a matter of some policy – whether contractual, job duty, or even written – that allegedly prohibited Nurse Asah from changing the tracheostomy tube, does not establish that changing it was below the standard of care or that the manner in which the task was performed was below the standard of care. A company (or parties to a contract) could decide to operate, or to try to operate, well above the minimal standard of care, setting policies accordingly. A breach of that policy would not necessarily mean that the care provided was negligent. Expert testimony is needed to corroborate that the policy was the minimal standard of care. The Supreme Court said as much in *FFE Transp. Servs., Inc. v. Fulgham*, relying on a series of health care liability cases on this very point. 154 S.W.3d 84, 92-93 (Tex. 2004).

71

*See also* CR 350-351.  A mere claim by the mother that Nurse Asah did something beyond her duties does not establish that her conduct was negligent; qualified experts must make that point.  The fact that both experts have to rely on Marente's claim about Asah's job duties only emphasizes that they do not know what the standard of care is for caring for a ventilator-dependent patient in a home-health setting.

The experts cannot overcome their lack of qualifications by relying on Marente's narrative for a second reason: Chapter 74 experts can only rely on opinions of other experts known to be qualified.  In *Jones v. King*, the San Antonio appellate court held that an expert could cure his own deficiencies by relying on a statement from another physician whose qualifications were unknown.  255 S.W.3d 156, 160 (Tex.App.—San Antonio 2008, pet. denied).  Here, however, Marable and Bingham explain no basis to know that Marente – who has no medical or nursing training – qualifies as one with expertise in any area of medicine or nursing – let alone this specific one.

Marente argues that her experts can rely on her written statement in forming their opinions.  Appellant's Amended Brief, 19-20.  But Appellees have never argued that experts cannot include

72

such information in their decision calculus – just that the information does not advance her position. That is true because her statement about Nurse Asah's job duties does not establish that exceeding the job duties amounts to a breach of the standard of care. A qualified expert must say that, and no qualified expert has.

Additionally, Marente's reliance on 74.402(d) in her Brief is misplaced. That provision allows – in limited circumstances – a court to depart from the other criteria in Section 74.402 when it determines a good reason exists to do so and states on the record the reasons for the departure. Tex. Civ. Prac. & Rem. Code § 74.402(d). The trial court here declined to make such a departure, and Marente raised no point of error on the subject, thereby waiving that issue for appeal.

Similarly, Marente's citation of the *Packard v. Guerra* case is unavailing. In that case, the plaintiffs had several physician experts but also included a legal expert on the complicated interrelationship between several corporate entities in an effort to justify keeping those parties in the suit at the expert report stage. 252 S.W.3d 511, 517-519 and 528-532 (Tex.App.—Houston [14th Dist.] 2008, pet. denied). The trial court specifically invoked 74.402(d) and stated the reasons on the record. *Id.* at 517-519. The appellate court determined that

that lawyer's report was appropriate given the complicated corporate structure and legal theories of extending liability to the corporations. *Id.* at 528-532. This legal precedent adds nothing to Marente's case because the trial court did not make the appropriate finding (on the record) and because Marente's statement, unlike the legal expert's opinions in *Packard,* has never been provided, i.e. a report from her was not served on Appellees. CR 351-352.

Finally, Marente's claim of Nurse Asah's job responsibility is just untrue. As this argument developed in the trial court, Marente asserted that, if Nurse Asah had responsibility for changing the tracheostomy tube, then surely Appellees would have produced records showing as much. *See* CR 337. While acknowledging that the trial court can only look at the four corners of the report, Defendants pointed out below that Nurse Asah did frequently change the tracheostomy tube. CR 353. One would think that having been proved wrong on this point, this argument would have withered away. Yet Marente persists in this Court with that argument that is factually inaccurate. Appellant's Amended Brief, 14.

Regardless, whether or not changing the tracheostomy tube was within Nurse Asah's job responsibility does not determine a standard

74

of care or a breach – or that Marente's experts were qualified to render opinions in that regard. The fact that the experts had to rely on Marente's statement to conclude that Nurse Asah should not have changed the tracheostomy tube only buttresses Appellees' argument that the experts were not qualified. If the experts had the knowledge and experience to say that Nurse Asah should not have changed the tracheostomy tube, then they should have said so from the beginning. Instead, their criticisms focused on her inability to re-insert the tube and the subsequent emergency instead of undertaking the obligation at all. CR 51, 66. Without sufficient qualifications for her experts, Marente failed to comply with the expert report requirement. The trial court did not abuse its discretion by determining that the experts did not have expertise in the very subject matter of the case and then dismissing the case due to Marente's insufficient expert reports.

### 5. Marable was not qualified to offer opinions about Epic's potential direct liability

Marente argues that Marable's report sufficiently addresses the direct liability claims against Epic. Appellant's Amended Brief, 13. But her argument only addresses the fact that Marable asserted that

75

Epic should have had certain "protocols" in place and that its failure was a breach of the standard of care. *Id.*[5] Marable never describes in his CV or either report any qualifications regarding the formulation of protocols for a health care entity. According to his CV, Marable never participated in any committee that might have formulated protocols for any health care entity, and the CV does not even indicate that he formulated protocols for his own employees. Likewise, both of his reports have no discussion of Marable ever being involved in the formulation of any protocols. Moreover, even if he had been on a hospital committee or had formulated protocols for his own practice, that experience would not show that he is qualified to opine about protocols for a home-health agency that supervised home-health nurses like Nurse Asah.

Marable also never explained how these mythical protocols – never described with any substance – would have prevented the outcome in this case. As explained in Marente's Brief, the protocols

---

[5] Purporting to quote from Dr. Marable's report, Marente speaks of inadequate policies regarding "dural sinus thrombosis and idiopathic intracranial hypertension." Appellant's Amended Brief, p. 13. Despite a review of the cited passages, Appellees were unable to find the purported quote. *See* CR 262-263. Dr. Marable's report contains references to certain breaches by Epic, but none of them relate to the previously quoted medical issues.

should have concerned "evaluation, consultation, admission, and follow-up that resulted in adequate care of patients *should an emergency condition arise.*" Appellant's Amended Brief, 13. As described by Marente, these protocols would be triggered following the emergency – thus they would not have prevented the tracheostomy tube from coming out and not being replaced. Further, the protocols – as explained by Marente – do not appear to guide treatment during the emergency. The protocols then cannot possibly change the outcome in this case; they do not prevent the tube from coming out, thereby triggering the same problems when it cannot be replaced. They do not provide what steps to take during the emergency and only address events that would occur after stabilization from the emergency. By then it is too late because, as Marable explained, Christian had been without oxygen for 10-14 minutes by that point. CR 67, 260.

Additionally, the merits of such a claim would still depend on the ability to establish a claim of nursing negligence as to Epic's employee, Nurse Asah. If the nurse that was subject to the policies did not breach the standard of care, then any deficiency in the policies could not have harmed Christian. Without a qualified expert

77

on the Nurse Asah portion of the case, the portion of Epic's policies would inevitably fail.

While both experts may have had other criticisms of Epic (such as supervision and training), Marente abandoned any claim regarding the sufficiency of those claims by not advancing them on appeal. Instead she focuses her claim of error solely on Marable's argument regarding protocols. Thus, she waived her claims for any other theory of direct liability against Epic. And even without waiver, she never demonstrated that either expert had any qualifications regarding any other potential theory of direct liability against Epic. Neither expert purported to supervise or train home-health nurses providing tracheostomy tube care, which is a prerequisite to being qualified on those direct-liability theories.

**C.** **While Marente did not need a separate expert on the issue of the vicarious liability, she still needed to have a qualified expert report for Nurse Asah's conduct in order for the vicarious liability claim to proceed; because Marente had no qualified expert regarding Nurse Asah, the vicarious liability claim against Epic failed**

Relying on *Obstetrical & Gynecological Assocs., P.A. v. McCoy*, Marente claims that Chapter 74 requires no expert report for claims of vicarious liability. Appellant's Amended Brief, 20. Her position

78

cannot be correct because, at a minimum, the claimant must serve reports that implicate the conduct for which vicarious liability is alleged to attach. The *McCoy* case proves that point. 283 S.W.3d 96 (Tex.App.—Houston [14th Dist.] 2009, pet. denied). There, the claimants sued two physicians and their professional association. *Id.* at 99. The only claim against the professional association was to hold it vicariously responsible for the conduct of the physicians. *Id.* The claimants served expert reports that implicated the conduct of each physician but did not address the association's conduct. *Id.* The unobjected-to reports about the physicians' conduct satisfied the expert report requirement for the vicarious liability claims. *Id.* at 102-103. The appellate court never held that a report for vicarious liability was not required – just that a report did not have to address the association by name. *Id.*

In fact, the Supreme Court's subsequent holding in *Certified EMS, Inc. v. Potts* disproves Marente's claim. 392 S.W.3d 625, 631-632 (Tex. 2013). There, the court held that the expert report requirement is satisfied as long as an expert report connects all the dots on at least one theory of liability – direct or vicarious. *Id.* Even with vicarious liability, a report that is sufficient as to the employee

79

satisfies the expert-report requirement for the employer. *Id*. at 632. The problem, for Marente, is that no sufficient expert report exists for Nurse Asah's conduct: the reports of Marable and Bingham did not show that they were authored by experts with the qualifications required in this case. Marente cannot, therefore, claim to have satisfied the expert report requirement for vicarious liability. The trial court did not abuse its discretion in determining that Marente had not provided an expert report for her claim of vicarious liability against Epic.

## D. The trial court did not abuse its discretion by finding the experts were not qualified and dismissing Marente's claims

A trial court abuses its discretion by ruling without reference to guiding rules or principles. *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015). Chapter 74 and the relevant case law demonstrates that the trial court acted with reference to guiding rules and principles. Thus, the rulings below cannot amount to an abuse of discretion.

First, Chapter 74 requires that the expert offering opinions about the conduct of a health care provider be involved in the "same type of care" as the defendant. Here, Nurse Asah provided tracheostomy care and then emergency care in a home-health setting. Neither expert had any experience with the "same type of care" as that provided by Nurse Asah. The trial court acted in reference to guiding principles.

Second, Chapter 74 also requires that expert practice that care "at the time" of the events in question or "at the time" of the testimony. Neither expert explained that they had the requisite experience during the relevant time period. The trial court again acted in reference to guiding principles.

Third, case law requires that an expert explain how their qualifications fit with the specific issue at hand in the case. A physician is not qualified merely because he is a physician. *Broders*, 924 S.W.2d at 153-154. An anesthesiologist is not qualified in the subject of anesthesia merely by holding the title of anesthesiologist, when he fails to explain his education and training and establish how he is qualified to render a standard of care opinion for the particular case. *In re Samonte*, 163 S.W.3d at 237-238. Similarly, a pharmacist

81

is not qualified on the standard of care for pharmacists just because he is a pharmacist. *Perry*, 2011 WL 6415135 at *3-4. These concepts reject Marente's theory that the nursing expert was qualified because she was a nurse and that the doctor was qualified because he was a doctor that interacted with nurses. Instead, these cases require that the expert explain why or how he or she is qualified in light of the particular factual scenario. Neither expert did. In this way, the trial court also acted with reference to guiding principles.

Finally, courts have held that an expert purporting to offer opinions about the policies and procedures for health care entities need to demonstrate that they have expertise in that arena. *Hendrick Med. Ctr.*, 298 S.W.3d at 788-789. Without a showing of involvement in drafting policies, a person does not qualify as an expert in that subject. *Id.* Thus, the trial court acted with regard to guiding principles in determining that neither expert was qualified regarding Epic's policies.

At all turns regarding the qualification of Marente's experts, the relevant provision of Chapter 74 and the attendant case law provide support for the trial court's actions. Guiding principles support the trial court's determination that Marente's experts were not qualified.

82

Thus, even if the trial court erred in determining that the experts were not qualified, that error did not amount to an abuse of discretion. This Court should, therefore, affirm.

## E. Marente's other arguments about the sufficiency of the reports on the statutory elements are irrelevant

Finally, Marente – throughout her brief – points out that her reports may have satisfied the specific statutory elements of Chapter 74. *See* Appellant's Amended Brief, 12, 13, 14-15. But such a discussion ignores what the trial court did and that the focus of the parties' dispute below centered on whether her experts were qualified. *See* CR 193-194 (containing the order sustaining the initial round of objections based on the lack of qualifications and granting a 30-day extension to cure). As a preliminary matter, the statutory elements must be provided by an expert, i.e. the report and CV "must illustrate that the person rendering the opinion therein is a qualified expert." *Chisholm v. Maron*, 63 S.W.3d 903, 907 (Tex.App.—Amarillo 2001, no pet.). Not vigilantly enforcing the requirement that the elements must come from an expert "fall[s] short of providing a basis for the trial court to conclude that the claims have merit." *Id.*

The fact that the reports may have specified a standard of care or a breach and may have explained causation does not answer the question of whether the experts were qualified. Without qualifications, the fact that the other elements may have been provided in the report is irrelevant. The trial court did not abuse its discretion in dismissing Marente's claims.

In the trial court, Marente also alleged that her assault claim survived the expert report challenge. In this Court, she has not asserted that any of her claims should have survived the expert report challenge, thereby waiving any error in that regard. More importantly, she could not assign error in that regard because the gravamen of her claims centered on the nursing care that Nurse Asah provided to Christian in his home. She cannot use artful pleading to avoid the expert-report requirement. *Yamada v. Friend*, 335 S.W.3d 192, 196 (Tex. 2010). *See also Loaisiga v. Cerda,* 379 S.W.3d 248, 255 (Tex. 2012)(holding that assault claim in the context of healthcare is presumed to be a health care liability claim). So the fact that Marente's pleading includes allegations beyond a traditional health care liability claim should give this Court no pause in affirming the trial court's dismissal of the entire case.

One last point: the result may seem unfortunate, and even harsh. The trial court recognized that in announcing its ruling. But Marente had previously received a 30-day extension to cure the qualifications issue. CR 194. The statute only permits a court to provide a claimant with one 30-day extension. Tex. Civ. Prac. & Rem. Code § 74.351(c). While dismissal may seem harsh, the statute provides no other recourse in this situation. Moreover, the fact that Marente ultimately failed to serve a report from an expert within the time permitted means that the law deems her case frivolous warranting this result.

Wherefore, Appellees Eunice Asah, R.N. and Epic Health Services, Inc. pray that this Court affirm the trial court's judgment in their favor, tax appellate costs in their favor, and grant them such other relief to which they may be entitled.

Respectfully submitted,


/s/ *David M. Walsh IV*
David M. Walsh IV
State Bar No. 00791874
dmwalsh@chambleeryan.com
Chamblee, Ryan, Kershaw &
    Anderson, P.C.
2777 N. Stemmons Freeway
Suite 1157
Dallas, Texas 75207
(214) 905-2003 – Telephone
(214) 905-1213 – Fax

Counsel for Appellee
Eunice Asah



/s/ *Winston L. Borum*
Winston L. Borum
State Bar No. 02675500
borum@borumhancock.com
Borum & Hancock, L.L.P.
801 Cherry Street
Suite 2485
Fort Worth, Texas 76102
(817) 336-4100, ext. 1 – Phone
(817) 336-4141 – Fax

Counsel for Appellee
Epic Health Services

## Certificate of Service

On December 14, 2015, I served a true and correct copy of Appellees' Brief on Appellant's and Epic's counsel by email and through the e-filing system

Douglas T. Floyd
3336 Therondunn Dr.
Plano, Texas 75023
lawyerfloyd@aol.com

Winston Borum
801 Cherry Street
Suite 2845
Ft. Worth, Texas 76102
borum@borumhancock.com

*/s/ David M. Walsh IV*
**DAVID M. WALSH IV**

## Certificate of Compliance

Relying on the word count in Microsoft Word (2007), I certify that this computer-generated document contains 14,014 words, excluding the items in Rule 9.4(i)(1), i.e. the caption, identity of parties and counsel, table of contents, index of authorities, statement of the case, issues presented, statement of jurisdiction, statement of procedural history, signature, proof of service, and certificate of compliance. The text for the body of this document is in 14-point font, and the footnotes are in 12-point font.

*/s/ David M. Walsh IV*
**DAVID M. WALSH IV**

FILED FOR RECORD

2015 JUN 23 PM 3: 55

MELANIE REED
DISTRICT CLERK
ELLIS COUNTY, TX

| | | |
|---|---|---|
| CRISTINA MARENTE | § | IN THE 40TH JUDICIAL |
| INDIVIDUALLY AND AS | § | |
| REPRESENTATIVE OF THE | § | |
| ESTATE OF CHRISTIAN | § | |
| MARENTE, DECEASED | § | |
| | § | |
| VS. | § | DISTRICT COURT OF |
| | § | |
| EUNICE ASAH AND EPIC | § | |
| HEALTH SERVICES, INC. | § | ELLIS COUNTY, TEXAS |

## ORDER ON DEFENDANTS EUNICE ASAH'S AND EPIC HEALTH SERVICES, INC.'S OBJECTIONS TO PLAINTIFF'S AMENDED CHAPTER 74 EXPERT REPORTS AND MOTIONS TO DISMISS

**CAME ON** to be heard(1) Defendant Eunice Asah's Objections to Plaintiff's Amended Chapter 74 Expert Reports and Motion to Dismiss and (2) Defendant Epic Health Services, Inc.'s Objections to Plaintiff's Amended Chapter 74 Expert Reports and Motion to Dismiss. After reviewing and considering the Motions, Plaintiff's Response, and the pleadings on file with the Court, the arguments of counsel at the two properly-noticed hearings on the Motions, and the subsequent additional briefing by the parties as requested by the Court, the Court rules that Defendants' Objections are **SUSTAINED** and rules that Defendants' Motions to Dismiss are **GRANTED**.

ORDER ON DEFENDANTS OBJECTIONS AND MOTION TO DISMISS    Page 1

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED**

that (1) Defendant Eunice Asah's Objections to Plaintiff's Amended Chapter 74 Expert Reports are **SUSTAINED** and Defendant Eunice Asah's Motion to Dismiss is **GRANTED** and (2) Defendant Epic Health Services, Inc.'s Objections to Plaintiff's Amended Chapter 74 Expert Reports are **SUSTAINED** and Defendant Epic Health Services, Inc.'s Motion to Dismiss is **GRANTED**. Plaintiff's claims against all Defendants are, therefore, dismissed with prejudice. The Court orders that Plaintiff take nothing against Defendants, who are hereby discharged.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED**

**THAT** the Defendant Eunice Asah recover her reasonable and necessary attorneys' fees and court costs as required under Section 74.351(b) of the Texas Civil Practice & Remedies Code as follows:

The amount of $ 47,360.00 from Plaintiff Cristina Marente, Individually and as Representative of the Estate of Christian Marente, Deceased, for recovery of reasonable and necessary attorneys' fees and court costs for work performed in this case.

The Court further orders that Defendant Eunice Asah recover her reasonable and necessary attorneys' fees and court costs in the amount of $ 25,000.00 from Plaintiff Cristina Marente,

**ORDER ON DEFENDANTS OBJECTIONS AND MOTION TO DISMISS   Page 2**

Individually and as Representative of the Estate of Christian Marente, Deceased, in the event of an ultimately unsuccessful appeals to the Court of Appeals.

Additionally, the Court further orders that Defendant Eunice Asah recover her reasonable and necessary attorneys' fees and court costs in the amount of $ 10,000.00 from Plaintiff Cristina Marente, Individually and as Representative of the Estate of Christian Marente, Deceased, if Plaintiff Cristina Marente, Individually and as Representative of the Estate of Christian Marente, Deceased, files a petition for review and review is not granted by the Supreme Court of Texas or if Defendant Eunice Asah seeks review in the Supreme Court of Texas that is ultimately successful.

Additionally, the Court further orders that Defendant Eunice Asah recover her reasonable and necessary attorneys' fees and court costs in the amount of $ 17,500.00 from Plaintiff Cristina Marente, Individually and as Representative of the Estate of Christian Marente, Deceased, if briefing on the merits is requested in the Supreme Court of Texas but review is ultimately denied (i.e. a petition for review is denied) or this Court's ruling is ultimately affirmed by the Supreme Court of Texas.

The Court further orders that Defendant Eunice Asah recover her reasonable and necessary attorneys' fees and court costs in the amount of $ 7,500.00 from Plaintiff Cristina Marente, Individually and as Representative of the Estate of Christian Marente, Deceased, in the event that a petition for review is granted by the Supreme Court of Texas and oral argument occurs in the case but review is ultimately denied or this Court's ruling is ultimately affirmed.

The Court further orders that Defendant Eunice Asah recover her reasonable and necessary attorneys' fees and court costs in the amount of $ -0- in the event that Plaintiff Cristina Marente, Individually and as Representative of the Estate of Christian Marente, Deceased, seek rehearing in the Supreme Court of Texas but that motion is ultimately denied.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED THAT** the Defendant Epic Health Services, Inc. recover its reasonable and necessary attorneys' fees and court costs as required under Section 74.351(b) of the Texas Civil Practice & Remedies Code as follows:

The amount of $ 10,000.00 from Plaintiff Cristina Marente, Individually and as Representative of the Estate of Christian

Marente, Deceased, for recovery of reasonable and necessary attorneys' fees and court costs for work performed in this case.

The Court further orders that Defendant Epic Health Services, Inc. recover its reasonable and necessary attorneys' fees and court costs in the amount of $ 8,333 33 from Plaintiff Cristina Marente, Individually and as Representative of the Estate of Christian Marente, Deceased, in the event of an ultimately unsuccessful appeals to the Court of Appeals.

Additionally, the Court further orders that Defendant Epic Health Services, Inc. recover its reasonable and necessary attorneys' fees and court costs in the amount of $ 3,333 33 from Plaintiff Cristina Marente, Individually and as Representative of the Estate of Christian Marente, Deceased, if Plaintiff Cristina Marente, Individually and as Representative of the Estate of Christian Marente, Deceased, files a petition for review and review is not granted by the Supreme Court of Texas or if Defendant Epic Health Services, Inc. seeks review in the Supreme Court of Texas that is ultimately successful.

Additionally, the Court further orders that Defendant Epic Health Services, Inc. recover its reasonable and necessary attorneys'

**ORDER ON DEFENDANTS OBJECTIONS AND MOTION TO DISMISS   Page 5**

fees and court costs in the amount of $ 5,833.33 from Plaintiff Cristina Marente, Individually and as Representative of the Estate of Christian Marente, Deceased, if briefing on the merits is requested in the Supreme Court of Texas but review is ultimately denied (i.e. a petition for review is denied) or this Court's ruling is ultimately affirmed by the Supreme Court of Texas.

The Court further orders that Defendant Epic Health Services, Inc. recover its reasonable and necessary attorneys' fees and court costs in the amount of $ 2,500.00 from Plaintiff Cristina Marente, Individually and as Representative of the Estate of Christian Marente, Deceased, in the event that a petition for review is granted by the Supreme Court of Texas and oral argument occurs in the case but review is ultimately denied or this Court's ruling is ultimately affirmed.

The Court further orders that Defendant Epic Health Services, Inc. recover its reasonable and necessary attorneys' fees and court costs in the amount of $ 0 in the event that Plaintiff Cristina Marente, Individually and as Representative of the Estate of Christian Marente, Deceased, seeks rehearing in the Supreme Court of Texas but that motion is ultimately denied.

These rulings complete the Court's resolution of Defendants Eunice Asah's and Epic Health Services, Inc.'s Objections to Plaintiffs' Amended Chapter 74 Expert Reports and Motions to Dismiss so that this Order (1) constitutes a final judgment regarding Plaintiff's claims against Defendants Eunice Asah and Epic Health Services, Inc., (2) resolves all claims against all parties, and therefore (3) constitutes a final appealable order.

SIGNED on this the ____ day of ___JUN 2 3 2015___, 2015.

_Bob Carroll_

**BOB CARROLL**
**JUDGE PRESIDING**

# Charles D. Marable, M.D.
## Consulting Neurologist

### 800 8th Ave, Ste. #118, Fort Worth, TX 76104

**Areas of Expertise:** Neurology, Medical Malpractice regarding Neurological issues, Closed-Head Injuries, Medical Case Management, Pharmacology, Spinal Injuries, Toxicology

**Professional Experience:** 26 years of experience in private practice, internships and hospitals; Consulting Neurologist, John Peter Smith Hospital, Ft. Worth, Texas (1986, 2004-2006)

Consulting Neurologist, Veterans Administration Medical Center, Dallas, Texas (1986 only)

Adjunct Clinical Instructor of Neurology, University of Texas Health Science Center at Dallas Southwestern Medical School, Dallas, Texas (1986 only)

Currently on Staff at Ft. Worth and Dallas Hospitals; Medical Plaza, Baylor All Saints and Forest Park Medical Center

**Education/ Training** B.S., Pharmacy Science, University of Texas at Austin
M.D., Universidad Autonoma de Guadalajara, 1976-1979
Fifth Pathway Internship, Loma Linda University Medical Center, Glendale, CA 1981

Internship in Neurology and Internal Medicine, Tulane University Medical School, New Orleans, Louisiana, July 1982- June 1983

Neurology Residency, Tulane University Medical School and Affiliate Hospitals, June 1983- June 1984

Neurology Residency, University of Texas Health Science Center at Dallas Southwestern Medical School and Affiliated Hospitals, Dallas, Texas

**Professional Qualifications:** Board Certified in Neurology
Tarrant County Medical Society
Texas Medical Association
Texas Neurological Society
American Academy of Neurology

**Cases/Clients:** Depositions-over 700
Plaintiff 90%, Defense 10%
Court appearances, case reviews

**Comments:** Bilingual- English and Spanish

71

 



# CHARLES D. MARABLE, M.D.
Diplomat of the American Board of Neurology and Psychiatry
800 8th Ave., Suite 118
Fort Worth, Texas 76104

817-334-0338 OFFICE                                                817-334-0586 FAX

August 20, 2013

Douglas T. Floyd
Attorney At Law
6521 Preston Road, Suite 100
Plano, Texas 75024

RE:    CAUSE # 86812; CHRISTIAN MARENTE v EUNICE ASAH AND EPIC HEALTH
       SERVICES, INC.

Please accept this as my amended formal expert report in the above case.

**RECORDS REVIEWED:** In arriving at the opinion set out later in this report, I have reviewed
the following items:

Medical records from Air Evac Lifeteam
Children's Medical Center records
East Texas Medical Center. - EMS
Texas Department of State Health Services Vital Statistics Death Certificate
Outpatient notes from Our Children's House
Progress notes from Dr. Jose J. Salguero, M.D.
Skilled Nursing Flowsheet dated 09/10/2012 signed by Eunice Asah, R.N.
Matters related to me regarding statements of Cristina Marente concerning the treatment of
Christian Marente

**BACKGROUND:** My name is Charles Douglas Marable, M.D. I am a Board Certified
Neurologist, and my place of employment is 800 8th Ave., Suite 118, Fort Worth, Texas
76104.

**QUALIFICATIONS:** I am actively practicing medicine now, as well as the time the incident
arose in an area relevant to the claim, I am Board Certified in Neurology. I have substantial
training and expertise in the area relevant to this claim. I have the knowledge of accepted
standards of medical care for the diagnosis, care and treatment of the injury, illness or condition
involved in this incident, which is that of anoxic encephalopathy, as suffered by this patient. I am
familiar with anoxic encephalopathy and have treated patients with this illness throughout my
residence, as well as in my private office and hospital practice. I have seen literally hundreds of

CDM/MARENTE - 08/20/13                    PAGE 1

patients who have sustained hypoxic as well as anoxic encephalopathy.

It is usually the neurology service that is consulted for episodes of anoxic encephalopathy, and usually the neurology service also asked to perform brain death examinations on patients.

Neurologists, as well as pulmonary medicine and neurosurgeons are usually the ones who have the ability in the ICU to handle ventilator settings.

I also have extensive expertise in dealing with pediatric as well as adult neurological cases. In fact, from 1986 to 2000, I did both pediatric and adult consuls, and from 2000 to the present time, I still see young children, but they are usually over age 13 or 14.

I currently and since 1986 regularly refer my neurological patients for home health care. As a result for these referrals, I write the orders for home health care treatment for nurses and then follow up with the patient to insure that they received the prescribed care and continue to receive that care if it is on going. This is a very common situation in my office.

And although I am not a Registered Nurse, because of my experience since 1986 in referring patients for home health care and working with nurses that provide home health care for my patients, I am qualified to ascertain when a nurse should have adequate qualifications to treat certain illnesses in the home health care environment. I am qualified to state the standard of care for a nurse treating Christian Marente and opine on the breach of the standard of care. My experience and training in working with health care institutions such as Epic Health Services, Inc., qualify me to render an opinion as to the standard of care for such institutions and opine on the breach of the standard of care.

**MEDICAL LEGAL STANDARD:** Unless stated otherwise, all my opinions in this report are based upon the medical legal standard of reasonable medical probability.

**FACTS OF CASE/OPINIONS:** Christian Marente was a 17-year-old male, DOB 5/12/95, with a history of Jeune syndrome, and restrictive lung disease. Jeune disease is a hereditary hypoplasia of the thorax, or also known as asphyxiating thoracic chondrodystrophy. This syndrome is a rare genetic disorder that affects the way a child's cartilage and bones develop, it basically affects the child's ribcage, pelvis, arms and legs. Due to the ribcage being narrow, this keeps the child's lungs from developing fully or expanding when the child inhales. They can also develop problems with their kidneys. This is taken from the article, "Jeune Syndrome" at Seattle Children's Hospital in Washington.

On 8/11/11 Christian MARENTE was seen for the first time by Dr. Salguero, who, noted his neurologic exam was normal, he was walking well, He was very pleasant and smart.

On 9/8/11 he was seen again with a normal neurologic examination.

On 9/14/11, he is seen by Dr. Salguero, who noted he to be alert with a normal neurologic exam.

CDM/MARENTE - 08/20/13          PAGE 2



On 11/23/11 he was seen again by Dr. Salguero, and was noted to be fully alert. His neurologic exam showed he had a normal gait. The neck was supple. He had a negative Brudzinski's, negative Kernig's, no meningeal signs, no focal signs, and was normal. The physician's assessment at that time was unspecified asthma, COPD, renal failure and kidney transplant status.

On 7/19/12 he was seen by Dr. Joseph Rosen at Our Children's House in Dallas, Texas.

On 9/10/12 Epic Health Services sent their employee, Unice Asah, RN, to care for Christian. Please note Epic Health Services provided home health care to Christian on a full-time basis in his house, and the nurses worked in 12 hour shifts from 7:00 AM to 7:00 PM, and 7:00 PM to 7:00 AM.

Please note, in January 2012, the patient had received a tracheostomy and was attached to a ventilator tube. The only time he was not on a ventilator was when he was being bathed. Even with the tracheostomy he was able to talk, and otherwise lead a reasonably active life with his family and friends.

It has been reported that on September 10, 2012, at approximately 5:00 p.m., Nurse Asah was bathing Christian in his home. There is conflicting information as to exactly what occurred next:

1.  Per the 911 call, Nurse Asah was alone and while putting Christian "back to bed" the "tracheostomy" came out.

2.  Per the Skilled Nursing Flowsheet Nurse Asah reported, "After I pulled out the dirty trach, I was unsuccessful inserting the clean 6.0 Bivona flex cuff trach. A second attempt with the 5.0 Bivona flex cuff trach available was unsuccessful."

3.  Per the response to an interrogatories propounded to Nurse Asah, her verified response was as follows:

    INTERROGATORY NO. 8: Describe in detail everything that you did with CHRISTIAN MARENTE in the one hour before his trach tube came out on September 10, 2012.

    ANSWER: Subject to and without waiving said objections, on September 10, 2012, Nurse Asah prepared to give Christian Marente a bath. She first laid out all of her supplies before getting started. That included the bath supplies, Christian's change of clothes, and all of the supplies for the tracheostomy change, including a clean 6.0 trach, a back-up (smaller) 5.0 trach, and an ambu bag - Christian's tracheostomy change occurred every Monday. Nurse Asah made all of these preparations before bathing Christian on September 10, 2012. Upon completing his bath and dressing Christian on September 10, 2012, Nurse Asah began to change his trach. The trach is held in place with soft ties that tie around his neck. She undid the ties and cleaned Christian's neck. In accordance with her standard procedure, which she had performed many times before, Nurse Asah then removed the existing trach and concurrently attempted to place the clean 6.0 trach into

CDM/MARENTE - 08/20/13                 PAGE 3

Christian's tracheostomy site, but it would not go in. She immediately grabbed the smaller, 5.0 trach and tried to place it into Christian's tracheostomy site, but it too would not go in. At that point, she immediately called 911 on her cell phone and proceeded to initiate CPR until emergency medical services arrived. In addition, please see the deposition of Nurse Asah when/if taken for further information concerning the care provided that day, as well as the relevant medical records related to this matter.

The EMT team found he had a cardiac arrest, found asystole at 1730 and absent respiratory drive. He was noted to have cyanotic skin. His capillary refill was delayed. His pupil size was pupil dilatation. Level of consciousness was unresponsive, with 0 out of 5 muscular strength. At 1754 his blood pressure was 94/62, pulse was 142, respiratory rate 13, source was supplemental. The AirEvac Lifeteam was then called at 1749 and arrived at 1809, and was with the patient at 1811. He was noted to be unresponsive level of consciousness. Loss of consciousness was noted to be "yes." His Glasgow Coma Scale was 3.

He was then transported to Children's Medical Center in Dallas, Texas. The neurology consultation note on Christian showed that the EMS was called and upon their arrival, he was still pulseless, so chest compressions were continued. He was given a dose of epinephrine it was estimated the episode of pulselessness lasted approximately 10-14 minutes, but the exact time was unclear. He was bagged in route from the Air Evac. In the Emergency Department he was given 3 liters of normal saline due to profusion, but did not require any pressure support. He was noted to have myoclonic jerks and was given Ativan 4 mg X2, Dilantin 1 gram, Keppra 1 gram, hydrocortisone and then an additional bolus of 10 mg/kg of phosphenytoin before movements decreased.

At that time, a stat CT of the head, was done on 9/10/12, showing mild volume loss involving primarily the frontal lobes, but no evidence of intercranial hemorrhage, mass effect of parenchymal edema.

He was noted to be obtunded upon arrival to the Emergency Room, but the mother stated he would walk and eat by mouth, interact with the family at home, which was his baseline prior to 09/10/2012 incident.

He was admitted to PICU and Neurology was consulted. EEG on 9/11/12 showed burst suppression pattern, but no seizure activity, and therefore anticonvulsants were stopped. The jerking was noted to be post agnostic myoclonus and not seizure activity.

He was also seen by nephrology and given Calcitrol, Lasix and immunosuppression.

MRI of the head on 9/12/12 showed extensive symmetrical infratentorial and supratentorial cytotoxic edema of the cortex, and supratentorial deep gray matter structures. These findings represent sequelae of profound global ischemic hypoxic insult.

He was seen by cardiology because of tachyarrhythmias, and had an atrial atopic tachycardia.

CDM/MARENTE - 08/20/13                    PAGE 4



Pulmonary medicine saw him and it was felt he had episodes of agitation with hypertension, tachycardia, increased respiratory rate, concerning for autonomic storming. He was given Versed, Fentanyl and Valium.

Then finally, the primary team had a long discussion with the mother about DNR.

It was noted on admission that the patient was unresponsive to verbal or tactile stimuli, but had reactive pupils and twitch like movements on exam. The reason for admission was acute respiratory distress, tracheostomy complications, altered mental status, fluid overload, kidney transplant complications, acute kidney injury, cardiac dysrhythmia, autonomic instability and cognitive dysfunction.

Attending, Dr. Matthias, M.D., made the comment 9/12/12 that they were very concerned about his neurological progression. Neurology also noted in their notes that the patient acquired stupor for 10-15 minutes, not well-documented, and had a questionable short generalized tonic-clonic seizure in the Emergency Room Department that indicated some anoxic brain injury and was loaded with phospholated Dilantin and Keppra. He noted the CT of the head and EEG. It was also noted that the prognosis had been verified after 24 hours from the event, so to keep the EEG on for now, and treatment of the myoclonic jerks could be treated with benzodiazepines, phenytoin or Valproic, though the usefulness is questionable given the very poor, prognosis.

During his hospital stay he was intermittently febrile and treated with Clindamycin and Ceftriaxone. He had occasional episodes of tachypnea, tachycardia and hypertension, probably due to neurological storming.

On 9/23/12, support was withdrawn due to the fact he had significant brain damage. His admit and final diagnoses were respiratory failure and hypoxic encephalopathy it was noted cause of death as cardiorespiratory arrest secondary to withdrawal of care, and severe brain hypoxic ischemia.

In a malpractice case, there are four elements that need to be fulfilled. There is care, breach of standard of care, causation and damages.

What is the specific conduct called into question? It is the conduct of nurse Asah RN. who fell below the standard of care when she failed to have the proper training and education for health care for tracheostomy patients, as well as her failure to properly care for the tracheostomy, as well as to immediately call 911 to ask for medical assistance, and failure to do CPR. It is the failure of this nurse that was the sole and etiologic cause for the severe anoxic encephalopathy.

Anoxic encephalopathy is defined as the complete lack of oxygen to the brain, which in general causes an encephalopathic picture, manifested by altered mental status that is accompanied by physical changes. Basically, anoxic encephalopathy means brain damage due to lack of oxygen. in this case, it had fatal manifestations, ending in coma and death of Christian Marente.

CDM/MARENTE - 08/20/13          PAGE 5

With regard to the standard of care for Nurse Asah the following standards are applicable:

1.  If a displaced tracheostomy tube is suspected, the standard of care requires bilateral auscultation of breath sounds, observation of chest rise and fall, and use of an exhaled $CO_2$ detector to assess for placement.

2.  The standard of care requires that obstructed tracheostomy tubes are suspected with decreased breath sounds bilaterally, or decreased chest rise and fall.

3.  The standard of care requires that saline be injected into the tracheostomy tube to thin secretions, then a properly sized suction catheter be passed into the tube and suction is applied to clear secretions from the tracheostomy tube.

4.  The standard of care for nursing requires that if the obstruction is still present, you shall repeat this procedure one time after attempting ventilation between attempts.

5.  If there is no improvement in respiratory distress, the tracheostomy tube will be changed immediately.

6.  The standard of care requires that if a tracheostomy tube does not pass easily, the attempt shall be made immediately with a smaller sized tube to re-establish an airway.

7.  After the tube is placed, assessing placement of the tube with at least two confirmatory measures such as listening to breath sounds, visualization of equal rise and fall of chest, and use of $CO_2$ detector shall be documented by the RN.

8.  The standard of care for severe airway obstruction in children requires that practitioners call early for advanced help.

9.  A reasonable and prudent nurse is required to realize the patient's critical assessment findings and initiate an emergency response immediately.

10.  To have the fundamental knowledge of CPR.

11.  To know tracheostomy care for a home care patient.

12.  To know how to properly position, remove and replace a tracheostomy tube.

13.  To know to call 911 immediately, identify herself appropriately and give the correct address of the facility.

**Describe the manner in which the care failed to meet the standards.**

Failures of Nurse Asah: As an RN working under the care of Epic Health Services, she was sent to care for and treat Christian Marente. Her duties included proper care and treatment of the

CDM/MARENTE - 08/20/13                    PAGE 6



tracheostomy tube.

1.  She failed to have the proper training for home health care for tracheostomy patients when she undertook to replace the trach, a procedure that was not her responsibility.

2.  She failed to properly reinsert the catheter in time to, prevent the severe anoxic damage.

3.  She panicked when she could not reinsert the trach.

4.  She failed to immediately call 911 when the crisis occurred.

5.  It was also noted in the 911 dispatch call of 6 minutes, the nurse did not identify herself as a Registered Nurse, therefore valuable time was loss with the resuscitation team giving her the basic principles of CPR.

Again, although I am not a nurse, but am a medical doctor, I have had extensive training with nurses during my residency as well as post residence and in hospitals. I have given multiple lectures to nursing staff throughout my time frame as an attending physician, and I have dealt with home health care nurses in the past as well as presently in my current day practice. I have had nurses in my office, and any doctor expects a nurse to be competent enough to fulfill certain duties as indicated by her education and training.

For example, a nurse in the Cardiac Care Unit would be expected to understand cardiac patients, to be able to understand the medications, methodology and treatment of cardiac patients.

As a home health care nurse, Nurse Asah, should have had the training, expertise and knowledge, because she was advertised as such, to care for tracheostomies and treat any type of emergencies that might arise in the home, especially in the care of Christian Marente, and at least be prepared to treat any emergency that should arise in a home health care patient.

All these above failures of Nurse Asah was the sole causation of the anoxic encephalopathy, which led to the hospitalization, coma and death of Christian Marente.

This is substantiated sufficiently in the medical records. Upon arrival by the EMS services, the patient was found to be asystolic (pulseless), and respiratory depressed. In other words, not breathing. He was quadriplegic or had flaccid paralysis, i.e., not moving any extremity. His Glasgow Coma Scale was 3 out of 15. In using the scale, one is given 5 points for eye opening, 5 points for verbal response, and 5 points for motor response. He got 1 point each for having no eye opening, no verbal response and no motor response, a total score of 3. Any score below 9, according to the literature, is a very severe score, and the lower the score usually indicates less chance of recovery. According to the CDC, based on motor response, verbal performance and eye opening to appropriate stimuli of the Glasgow Coma Scale were designed and should be used to assess the depth and duration of coma and impaired consciousness. This scale helps to gauge the impact of a wide variety of conditions such as acute brain damage, and in this case,

CDM/MARENTE - 08/20/13          PAGE 7

due to severe anoxia sustained by this patient.

It is estimated the patient had lack of oxygen for at least 10-14 minutes. It is known that the brain requires a constant flow of oxygen to function normally. A hypoxic anoxic injury occurs when that flow is disrupted, essentially starving the brain and preventing it from performing vital biochemical processes. However, anoxic means a total lack of oxygen. In general, the more complete the deprivation, the more severe the harm to the brain, and the greater the consequences. Diminished oxygen supply can cause serious impairments in cognitive skills, as well as physical, psychological and other functions. Most textbook and sources state that about 5 minutes is the time we start seeing dying of the cells.(Ischemia)

According to Clay Goodman, M.D., Associate Professor of Neuropathology at Baylor College of Medicine, his 1997 Neuropathology Notes, pages 18 and 19, talk about global ischemia, which leads to widespread tissue injury, resulting in conditions referred to ischemic encephalopathy, which this patient suffered. The more severe injury may lead to dementia and spasticity. If the ischemic period is protracted, the patient may not regain consciousness, and may exhibit decorticate posturing and seizures, and may remain in a vegetative state indefinitely. Certain cell populations that are selectively vulnerable to ischemic injury include large neurons of some of the sectors of the hippocampus, Purkinje cells of the cerebellum and neurons of layers 3 and 5 of the cerebral cortex.

Not only did Christian Marente's brain undergo oxygen deprivation, the brain was also deprived of adequate blood flow.

It is also noted the patient had been found to be pulseless and without respiratory drive. It was further ascertained he had a poor Glasgow Coma Scale of 3. Upon his arrival at the Children's Medical Center in Dallas, he still had a very poor prognostic indication of being comatose with pupils dilated, and basically flaccid with no neurological response, except for pupillary reaction. This was further substantiated by the burst suppression EEG and the MRI findings, which I will elicit further on.

Prognosis Following Cardiopulmonary Resuscitation by Frank Thomke and Sasha L. Weilemann.; from the DTSCHARZTEBL 2007; 104(42)2869-85, states that patients who have undergone cardiopulmonary resuscitation have a poor prognosis. Fewer than 5% survive resuscitation on average in rural areas, while in cities up to 1/3 survive. They either die soon afterwards or else survive with severe irreversible brain damage, causing permanent unconsciousness.

Therefore, what were the parameters for the prognosis assessment of resuscitative patients? Age, underlying illnesses, etiology of cardiac arrest, type of cardiac arrhythmias, lifesaving measures, interval between from collapse to arrival to the Emergency Room, spontaneous respiration, light response, gag or cough reflex, Glasgow Coma Scale, physical findings, generalized myoclonus, pupillary light responses. The patient had generalized myoclonus and pupillary light responses. He did not have response to painful stimuli. His Glasgow Coma Scale was 3. Length of

CDM/MARENTE - 08/20/13                    PAGE 8

unconsciousness was approximately 10 minutes. Electrophysiology studies such burst suppressant EEG and MRI showed characteristic cortical damage.

The MRI report of 9/12/12 showed extensive symmetrical infratentorial and supratentorial cytotic edema of the cortex and supratentorial deep gray matter structures, findings representing sequelae of profound global hypoxic/ischemic insult,

The prognosis of patients in coma with generalized myoclonus with 24 hours of cardiopulmonary resuscitation show that out of 202 studied, 191 died. Lack of motor response to anoxic stimuli of the face and limbs is considered to indicate a poor prognosis if the finding was made 3 days after resuscitation. On further studies, they did not know of any patient who had generalized or early post anoxic myoclonus combined with an EEG with burst suppression who went on to have a favorable course. Specifically, a burst suppression in EEG pattern are the absence of cerebral electrical activity in the first 2-3 days after resuscitation, and are definite signs of impending death or a persistent vegetative state, as indicated in this individual.

In "Journal of Clinical Neurophysiology," March: 14(2): 153 9165410, citation 7, Clinical Accompaniments of the Burst Suppression EEG Pattern by Reeves, Westmoreland and Clauss from the Mayo Clinic stated the burst suppression on the EEG following anoxic insult is usually associated with a poor prognosis. Myoclonic jerks may accompany the electronic bursts. The Thomke and Weilemann article also state that the clinical electrophysiological or biochemical findings unanimously point toward a poor prognosis, One can no longer assume that the patient will regain his or her premorbid functional level, or survive with only with mild neurological impairment. Therefore, brain damage has occurred of such severity that nothing better than a permanent vegetative state or persistent neurological deficit with permanent dependence on nursing care can be expected.

On 9/10/12 we initiate note that the CT scan of the head did not show any infarcts, hemorrhages or any other cause that could have led to the coma. In fact, the CT of the head did not show any events, However, within 2 days the MRI showed the characteristic changes that one would note after cell death has started occurring, with the cytotoxic edema of the infratentorial and supratentorial areas. Also it was recognized by the radiologist that these represented sequelae of profound global hypoxic/ischemic insult.

The article, "Clinical Review in Pronounced MRI Imaging and Acute Brain Injury and Coma," by Wise, Galanaud, Carpenter, Naccache, and Puybasset, coming from Critical Care 2007: 11(5): 230, October 18, states the MRI is more sensitive than CT in detecting stroke in the early phase, subtle abnormalities related to anoxic/hypoxic encephalopathy and diffuse axonal injury.

With regard to the standard of care for Epic Health Services, Inc.: Epic Health Services, Inc. had a duty to provide properly trained and experienced nurses to care for patients like Christian Marente. The standard of care required the following:

1.      When a patient with tracheostomy tube is being monitored by a nurse, the nurse must

provide a safe environment for the patient and be ready to initiate emergency measures should the need arise.

2.    All measures involving the patient must consider the possibility of accidental dislodgment of the tube and be done in such a way to minimize such risks.

3.    Epic Health Services, Inc., must ensure that nurses are be trained to understand the risk of tube displacement in order to minimize the risk of its occurring and to manage the patient should it occur.

4.    Epic Health Services, Inc., must provide for careful handling of the patient, close monitoring of the patient to plan for immediate recognition of the tracheostomy tube being displaced, and several plans for securing the airway should accidental dislodgment occur.

5.    With any deterioration in the patient's condition, or when a patient exhibits signs and symptoms of respiratory distress as Christian Marente did, dislodgment or obstruction of the tube must be considered as the possible cause, even if external parts of the tube visually appear to be normally positioned.

6.    When a tracheostomy tube becomes displaced or obstructed and there is a deterioration in the patient's condition, all applicable professional help must be immediately mobilized to remove any obstruction or correct any dislodgment. This must include immediate contact of the physician in attendance and the surgeon who placed the tracheostomy and immediate initiation of emergency code procedures.

7.    A tracheostomy tube of the same type and size as the one used, plus one of size smaller must be at the bedside. An obturator for the tube in place must be placed at the bedside in a highly visible location.

8.    The nurse must understand that a tracheostomy tube should never be subjected to being bag ventilated unless it is known to be in the trachea.

**Therefore, how did the violation of the standard of care cause injury.**

The negligence of Nurse Asah, RN, who represented Epic Health Care, by failing to properly care for a home health trached patient, inability to replace the tracheostomy in a timely fashion, and her inability to handle even simple CPR and 911 emergency calls, was the direct etiological cause of the lack of oxygen, encephalopathy and brain damage to *Christian Marente*. He was found to be asystolic or pulseless, and without respiratory drive, and felt he was down somewhere between 10 and 15 minutes. This is substantiated by the findings of the EMT's where they found him pulseless and without respiratory drive. It was also substantiated by the poor Glasgow Coma Scale of 3. It was further substantiated by the findings in the Emergency Room, where he had seizure activity, then myoclonus, then proceeded to have a burst

CDM/MARENTE - 08/20/13                    PAGE 10



suppression EEG followed by a positive MRI, which was characteristic of a hypoxic event.

It is also well-known, as indicated above, that the brain comprises less than 5% of the body's weight, but basically consumes about 20% of the body's oxygen. Significant cerebral hypoxia and anoxia led to the death of the cells in the brain, especially the cells of the hippocampus, the Purkinje's cells and layers 3, 5 and 6.

Therefore, had Nurse Asah been more properly schooled in tracheostomy protocol, had not removed the track, or successfully removed it and replaced it with a new track, this injury would not have occurred. It was also noted the child, prior to this, was able to walk and talk, had a fairly normal neurologic exam according to prior reports. It was even noted when he appeared to the hospital the CT scan initially did not show any evidence of an infarct or any evidence of a bleed. It was only after 2 days that the MRI showed the more global effects of the anoxia.

It is my expert opinion that Nurse Asah panicked and did not act appropriately, timely or professionally during Christian's crisis. As a nurse, Nurse Asah should have been prepared to care for Christian and treat the type of emergency that happened on 9/10/12. It is further my expert opinion that Epic Health Services, Inc., failed to properly supervise Nurse Asah and failed to ensure that Nurse Asah was trained and prepared to respond to the emergency situation that occurred on 9/10/12. Accordingly, the failure on the part of Epic Health Services, Inc., to ensure that Nurse Asah was trained and prepared to deal with an anticipated situation, directly led to the injury and death of Christian Marente.

If you need any additional information, please let me know, and I will comply with any reasonable request. This report is being written in an attempt to inform all parties exactly what my opinions in this matter are, how and, why I arrived at them, what the standard of care is regarding the treatment in question, how the standard was violated, and how the violation of the standard caused the injury in question. I reserve the right to change, alter, amend or withdraw my opinions should any additional information be made to me after the date of this report.

Sincerely yours,

Charles D. Marable, M.D.
Board Certified in Neurology
Board Certified in Geriatric Medicine

CDM/bls May be subject to transcription variance.

CDM/MARENTE - 08/20/13          PAGE 11



**Patti Bingham, RN**
106 Calle Ricardo
Victoria, Texas 77904
Cell: (361) 652-3558
Fax: (361) 575-8312
pattirnnurse@yahoo.com

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 4/4/11 – | **The Courtyards, [Rehabilitation & Nursing Home]** 3401 E. Airline, Victoria, Tx 77901 |
| Present | Weekend RN supervisor – Supervisor/Clinical responsibilities include overseeing all nursing care throughout the facility, monitoring vital signs, passing medications, change dressings, trach care, conduct range of motion exercises, check the status of wounds, administer enemas and start intravenous [IV] medications and fluids. |
| 2/25/11 - Present | **Blackburn Group, Inc.,** 6709 Glenkirk Road, Baltimore, MD 21239 [Medicare Set Aside (MSA) and Claim Settlement Solutions Company] Assisting with MSA/Future medical cost projections (including Workers Compensation) |
| 1/2/2011 – Present | **Jackson Davis Healthcare,** 3570 E. 12th Ave, Denver, Colorado 80206 Medicare Audit Defense and Medicare Appeals – Nurse Auditor |

01/2008 **Citizens Medical Center,** 2501 Medical Drive, Victoria, Texas 77901
–12/28/2010 **Charge/Staff Nurse of Day Surgery**

- Responsibilities include clinical and supervisory: starting IV's, managing Foley catheters, assessing post-operative patients, managing and implementing patient care; staffing requirements; participating in Quality Assurance program; auditing medical records and following up with patient care satisfaction surveys.

5/25/06 – **Triumph Hospital Victoria,** 506 E. San Antonio St, Victoria, Texas (PRN & Full
02/21/08 Times Status)

- Charge Nurse/Clinical Staff Nurse - responsibilities included planning, managing, and assessing care, administration of medications and treatments, maintain record of codes and care, wound care, and assisted with wound VACs.
- Charge nurse/ Clinical Staff Nurse - Medical Observation Unit (comparable

Updated: 08/15/2013
P. Bingham                                          1



to Step Down Unit) – duties included starting IV's, monitoring patient's respiratory ventilation – tracheotomy's, intubations, pulse oximetry, respond to all codes, set nasogastric and monitor dobhoff feeding tubes, foley and swan ganz catheters, central and arterial lines, temporary pacemakers.

| | |
|---|---|
| 2003–2008 | **Hospice of South Texas,** 605 Locust Ave., Victoria, Texas 77901 |

**Admissions Coordinator / Case Manager/ Clinical Nurse**
- Responsible for coordinating admissions between hospitals, nursing homes, private homes, and respite care facilities along with durable medical equipment companies and pharmacies, coordinated care, and assessed and interpreted needs and requirements
- Responsible for clinical care of patients – Obtaining doctor's orders, starting and maintaining IV's catheters, Hypodermoclysis, Foley catheters, pain and nausea control, managing pain pumps, obtaining blood/urine for cultures, trach care, etc.
- **Case Management responsibilities:** Make initial assessments regarding patient treatment plans and establish collaborative relationships with physicians, clients, patients, and providers, coordinated patient's care, and assessed and interpreted needs and requirements, coordinated admissions with discharge planners from hospitals and transferring patients to Nursing Home's and family homes assuring the necessary medications and equipment were available.

| | |
|---|---|
| 07/27/1998–12/23/2003 | **Citizens Medical Center,** 2501 Medical Drive, Victoria, Texas |

**Operating Room Staff Nurse**
- Functioned as a circulating nurse in all surgical disciplines including, general, vascular, orthopedic, OB-GYN, urology, and primarily cardiac patients.
- Responsible for pre-operative and intra-operative phases of surgical experience, requiring knowledge of general and specialty equipment and instrumentation, comprehensive record keeping and review.
- Aided conscious sedation of patients undergoing heart catheterizations, angioplasties, liver biopsies, and peripheral vasculature runoff studies.

**Emergency Room**
- Charge nurse - responsibilities included managing and staffing a 15 bed emergency room department.
- Ensure the provision of quality emergency medical care to patients requiring emergency treatment in accordance with physician orders,

Updated: 08/15/2013
P. Bingham                                                 2



hospital policy, and standard nursing practice.
- Triage and performed patient assessment and nursing diagnosis.

1993-1998
- Manage the planning and implementation of interventions.

**Matagorda General Hospital, 1115 Ave G, Bay City, Texas 77414**
**Operating Room Staff Nurse**
- Functioned as a circulating nurse in all surgical disciplines including, general, vascular, orthopedic, OB-GYN, and ENT
- Responsible for pre-operative and intra-operative phases of surgical experience, requiring knowledge of general and specialty

**Matagorda Home Health Agency**
- Duties included assessments of systems, wounds, intravenous sites, medications – subcutaneously or intramuscular injections, any ordered treatments – tracheostomy care; breathing treatments, blood draws, intravenous flushes, dressing changes, or wound care the doctor has ordered, and teaching as indicated.

**Trauma Coordinator / ER Staff Nurse**
- Provided oversight for all clinical policies and procedures in accordance with local and state accrediting body standards; Adhered to state Trauma guidelines and hospitals and State Trauma policies, procedures, and reporting requirement
- Made initial assessments regarding patient treatment plans and established collaborative relationships with physicians, families, patients, and providers, ensured that patients received the proper levels of care

- Ensure the provision of quality emergency medical care to patients requiring emergency treatment in accordance with physician orders, hospital policy, and standard nursing practice.
- Triage and performed patient assessment and nursing diagnosis.

## EDUCATION

- Associate in Applied Science Nursing, Wharton County Jr. College, Wharton, Texas – September 22, 1993
- Associate in Applied Science Registered Dental Hygiene, Bee County Jr. College, Beeville, Texas - June 30, 1980

## PROFESSIONAL CERTIFICATIONS

- Certified Adult, Child, & Infant CPR – American Heart Association 2010 Guidelines - Current
- N H T.I.L.E. Training on Long Term Care Standards for Medicaid – Texas State University, San Marcos; 6/20/2005

Updated: 08/15/2013
P. Bingham                            3

- National Board for Certification of Hospice and Palliative Nurses (CHPN) – Inactive

- Certification Nurse Operating Room (CNOR) – Inactive
- Pediatric Advanced Life Support
- Advanced Cardiac Life Support
- Trauma Nursing Core Course

## PROFESSIONAL ASSOCIATIONS
- National Alliance of Certified Legal Nurse Consultants
- American Association of Legal Nurse Consultants

Updated: 08/15/2013
P. Bingham        4

**Patti Bingham, RN**
106 Calle Ricardo
Victoria, Texas 77904
Cell: (361) 652-3558
pattirnnurse@yahoo.com



August 20, 2013

Douglas T. Floyd
Attorney at Law
6521 Preston Road, Suite 100
Plano, Texas 75024

RE:    Mr. Christian Marente

Dear Mr. Floyd:

Please accept this report as my expert report under Tex. Civ. Prac. & Rem. Code § 74.351. This report replaces the report of January 8, 2013 and June 22, 2013.

## RECORDS REVIEWED

In arriving at the opinion set out below in this letter, I have reviewed the following items:

1.    Medical records from Air Evac Lifeteam – 2 pages titled "Preliminary Patient Care Record" [Email: Medical_Records_ 1-25]
2.    Children's Medical Center medical records
3.    ETMC-EMS; Run Number: 110658; Date of Service: 09/10/2012; pages 1-4 of 4
4.    Outpatient Note from Our Children's House at Baylor 07/19/2012,
5.    Kidney Transplant Visit Note, 06/20/2012, 1-4 pages,
6.    Progress Note: Jose J. Salguero, MD Office Notes: 11/23/2011, 09/14/2011, 09/8/2011, 08/11/2011,
7.    Telephone Encounters.
8.    Skilled Nursing Flowsheets dated: 08/06/2012, 08/07/2012, 08/13/2012, 08/20/2012, 08/27/2012, 09/3/2010
9.    Skilled Nursing Flowsheet dated 09/10/2012 signed by Eunice Asah, R.N.
10.    Report of Cristina Marente.

## BACKGROUND

My name is Patti Bingham. I am a Registered Nurse in the State of Texas. My Texas Nursing Certification Number is 593336. I have been a registered nurse in Texas since September 22, 1993.

MARENTE 08/20/13                    PAGE 1



## QUALIFICATIONS

I am presently a registered nurse in Texas and have been so registered for over 20 years. I have continued to use my nursing skills within those 20 years. I have worked in both the emergency room and operating room at various hospitals in Texas. I have been certified in Pediatric Advanced Life Support and Advanced Cardiac Life Support. I am qualified to care for pediatric, adolescent, and adult patients in all nursing settings.

I presently work at The Courtyard Rehabilitation & Healthcare Center, 3401 E. Airline, Victoria, Texas, 77901, as a Registered Nurse supervisor. This 56-bed facility currently has 49 residents. The Center provides medical management and 24-hour skilled nursing care, including intravenous [IV] therapy with antibiotics, TPN administration, and diabetic therapy. The Center has physical medicine and rehabilitation and offer wound care. Rehabilitative services include Speech, Physical, and Occupational Therapy. My supervisory responsibilities include ensuring there is adequate nursing staff during the weekends and assessing the health needs of each resident. I supervise 3-4 Licensed Vocational Nurses [LVN] and 3-4 Certified Nurse Aides [CNA] during the weekends. I oversee the care these nurses give our patients and inform the physicians and families as patient care/conditions warrant. In addition to my supervisory duties, I work with the other nurses performing patient care. I monitor patients for signs of stress or difficulty breathing and perform complete, total assessments on patients. While I currently do not have tracheostomy patients at the facility, I have treated patients with tracheostomy at the nursing home many times in the past. I am personally familiar with the nursing standard of care to be delivered to patients with tracheotomies.

I have personal knowledge of the accepted standards of care for a registered nurse in Texas in the same type of care or treatment that Nurse Asah delivered to Christian Marente on September 10, 2012.

1. On September 10, 2012 and at all relevant times to the present, I have practiced in the health care field of a registered nurse that involved the same type of care or treatment that Nurse Asah delivered to Christian Marente on that date. That type of care or treatment is more specifically identified below.

2. I have knowledge of the accepted standards of care for a registered nurse of the care or treatment for the condition involved in the claim against Nurse Asah and Epic Health Services, Inc. My knowledge is of the accepted standards of care is more specifically indentified below; and

3. I am qualified based on my 20 years of training and experience to offer an expert opinion regarding those accepted standards of care as shown in my curriculum vitae attached hereto.

## BRIEF HISTORY AND SUMMARY OF CARE

Christian Marente was a seventeen-year-old male with a history of Jeune syndrome and restrictive lung disease. Jeune syndrome (asphyxiating thoracic dystrophy, ATD) is a rare autosomal recessive skeletal dysplasia [dysplasia is an abnormality within the cells of tissue that

MARENTE 08/20/13                    PAGE 2

affects growth, development and function] characterized by a small, narrow chest and variable limb shortness. There is a considerable neonatal mortality as a result of respiratory distress. Renal, hepatic, pancreatic, and ocular complications may occur later in life. Christian had respiratory complications that had left him with a tracheostomy and mechanical-ventilator dependent. He had asthma and chronic kidney disease and had received a kidney transplant in July 2007.

On January 5, 2012, Christian underwent a tracheostomy at Children's Medical Center Dallas.

On July 19, 2012, Christian had a medical check-up with Dr. Joseph Rosen at Our Children's House in Dallas, Texas. Per Dr. Rosen's notes, Christian was eating and drinking by mouth and was on continual oxygen at 2 liters per minute. He had not had any Emergency Room visits since 4/10/2012. Per his mother and Dr. Rosen's notes, Christian was "without coughing or wheezing." His tracheostomy cuff was deflated during the day and had 3 liters during the night.

Beginning in February 2012, Nurse Asah, provided general nursing services for Christian, usually from 7:00 a.m. until 7:00 p.m, Monday through Friday. Per the Flow Sheets Between August 6, 2012 and September 3, 2012, the general nursing services provided by Nurse Asah were:

Monitor the vital signs of Christian;
To annotate the Skilled Nursing Flowsheet daily;
Monitor the ventilator equipment;
Check the mucus build up in the trach and suction the mucus out periodically;
Clean around the trach opening;
Observe Christian for any signs of stress or difficulty breathing;
Bath Christian as required.

In the Skilled Nursing Flowsheets named above, at no time did Nurse Asah change Christian's tracheostomy.

It has been reported that on September 10, 2012, at approximately 5:00 p.m., Nurse Asah was bathing Christian in his home. There is conflicting information as to exactly what occurred next:

1.     Per the 911 call, Nurse Asah was alone and while putting Christian "back to bed" the "tracheostomy" came out.

2.     Per the Skilled Nursing Flowsheet Nurse Asah reported, "After I pulled out the dirty trach, I was unsuccessful inserting the clean 6.0 Bivona flex cuff trach. A second attempt with the 5.0 Bivona flex cuff trach available was unsuccessful."

3.     Per the response to an interrogatories propounded to Nurse Asah, her verified response was as follows:

INTERROGATORY NO. 8: Describe in detail everything that you did with CHRISTIAN MARENTE in the one hour before his trach tube came out on September 10, 2012.

MARENTE 08/20/13                    PAGE 3

241



ANSWER: Subject to and without waiving said objections, on September 10, 2012, Nurse Asah prepared to give Christian Marente a bath. She first laid out all of her supplies before getting started. That included the bath supplies, Christian's change of clothes, and all of the supplies for the tracheostomy change, including a clean 6.0 trach, a back-up (smaller) 5.0 trach, and an ambu bag - Christian's tracheostomy change occurred every Monday. Nurse Asah made all of these preparations before bathing Christian on September 10, 2012. Upon completing his bath and dressing Christian on September 10, 2012, Nurse Asah began to change his trach. The trach is held in place with soft ties that tie around his neck. She undid the ties and cleaned Christian's neck. In accordance with her standard procedure, which she had performed many times before, Nurse Asah then removed the existing trach and concurrently attempted to place the clean 6.0 trach into Christian's tracheostomy site, but it would not go in. She immediately grabbed the smaller, 5.0 trach and tried to place it into Christian's tracheostomy site, but it too would not go in. At that point, she immediately called 911 on her cell phone and proceeded to initiate CPR until emergency medical services arrived. In addition, please see the deposition of Nurse Asah when/if taken for further information concerning the care provided that day, as well as the relevant medical records related to this matter.

As documented in the EMS Patient Care Report, Nurse Asah "made multiple attempts to place the trachea tube back into place but has been unsuccessful." Christian received Bag-Valve-Mask [BVM] ventilation and became pulseless. Nurse Asah began chest compressions. EMS was called and upon arrival continued Cardio-pulmonary resuscitation, obtained a blood pressure and then transported Christian to Children's Medical Center, Dallas, Texas for ongoing care. Christian had been pulseless approximately 10-15 minutes but the exact time is unclear from the medical records.

As reported by Cristina Marente, the mother of Christian Marente, Nurse Asah had never changed the trach of Christian and the changing of the trach was never the responsibility of Nurse Asah. The changing of the trach was solely the responsibility of Cristina. Cristina had received special training in February 2012 at Baylor Hospital Dallas on the procedure for changing the trach. In fact, the medical records show that the trach was changed every Monday on the shift following the end of the shift of Nurse Asah. The procedure of changing the trach started in February 2012 and continued through September 3, 2012 when the trach was changed every Monday by Cristina shortly before Christian went to bed. The Skilled Nursing Flowsheet of Nurse Asah shows that the last time the trach was changed was September 3, 2012. The Skilled Nursing Flowsheet for Monday, September 3, 2012 shows that the trach of Christian was changed on the shift of Nurse Modupe Olojo that began at 7:00 p.m. on that date and on all proceeding Mondays during the relevant time period.

## BASIS OF EXPERT ANALYSIS

On September 10, 2012, at approximately 5:15 p.m. Nurse Asah was in the home of seventeen year-old Christian Marente providing general nursing care or treatment as set forth above when the trach was removed by Nurse Asah. Removing or changing of the trach was not the responsibility of Nurse Asah. Nurse Asah was unable to re-insert the trach or a second smaller trach. She then began bag-valve masking [BVM] Christian through his trachea in which she had told the 911 dispatcher the trach was "halfway in."

MARENTE 08/20/13                    PAGE 4

Nurse Asah spoke with the 911 dispatcher for a total of 6 minutes. During this time, she did not identify herself as a Registered Nurse. The 911 dispatcher wasted valuable time explaining to Nurse Asah how to complete the Cardio-pulmonary resuscitation [CPR] procedures.
Per EMS records, page 1/4, EMS received the call at 17:23 and arrived at the home 17:28. Upon arrival, Christian did not have a pulse, and CPR was continued. EMS documented "Pt's trachea opening is blocked by the pt's neck." They noted inserting a "6.0mm ET tube through his trachea." They then transferred Christian to the airport where air-team emergency flight, Air Evac 74, met them and transferred Christian to Children's Medical Center in Dallas, Texas.

## THE STANDARD OF CARE APPLICABLE TO NURSE ASAH ON 09/10/12:

The Standard of Care for a registered nurse is the level at which the average, prudent provider in a given community would practice. It is how similarly qualified practitioners would have managed the patient's care under the same or similar circumstances. In my opinion, the appropriate standard of care that Nurse Asah should have provided Christian Marente was dependent on the duties and responsibilities of Nurse Asah in caring for Christian. Those duties and responsibilities were to properly:

1.     Monitor the vital signs of Christian per the Skilled Nursing Flowsheet daily;

2.     To annotate the Skilled Nursing Flowsheet daily;

3.     Monitor the ventilator equipment;

4.     Monitor the mucus build up in the trach and suction the mucus out periodically;

5.     Clean around the trach opening;

6.     Observe Christian for any signs of stress or difficulty breathing;

7.     Bath Christian as required.

It is my opinion that the medical condition of the patient is not the determinative of the standard of care if the duties and responsibilities of the assigned nurse do not require any specialized training based on the patients actual medical condition. In this case, the fact that Christian had a history of Jeune syndrome and restrictive lung disease did not require Nurse Asah to have any specialized training to perform her assigned nursing duties as set forth above. Additionally, the location of the nursing services provided by Nurse Asah did not require any specialized training to perform her assigned nursing duties. The standard of care would be the same whether or not in a hospital, nursing home, or private home.

## BREACHES OF THE STANDARD OF CARE BY NURSE ASAH:

It is my opinion that on September 10, 2012, Nurse Asah breached the Standard of Care applicabale to Eunice Asah, RN, as follows:

MARENTE 08/20/13                    PAGE 5

1.  Nurse Asah, RN breached the nursing Standard of Care when she removed the trach from Christian; a procedure that was not her responsibility.

2.  Nurse Asah, RN breached the nursing Standard of Care when she failed to immediately call appropriate emergency medical assistance when the patient showed initial signs of distress.

3.  Nurse Asah, RN breached the nursing Standard of Care when she failed to give the 911 dispatcher the correct street address of 311 East Freeman Street.

4.  Nurse Asah, RN breached the nursing Standard of Care when she failed to immediately identify herself as a registered nurse resulting in unnecessary delay.

5.  Nurse Asah, RN breached the nursing Standard of Care when she failed to properly communicate with the 911 operator.

6.  Nurse Asah, RN breached the nursing Standard of Care when she failed to remain calm and collected in a professional manner.

7.  Nurse Asah, RN breached the nursing Standard of Care when she failed to have the proper training for home health care for tracheostomy patients.

To achieve positive outcomes in patients with trach tubes, every nurse needs to keep abreast of the best practices, develop, and maintain the necessary skills. A nurse who performs trach care needs to be familiar with their facility's policy and procedure. Per the Six-Step Decision-Making Model for Determining Nursing Scope of Practice in Texas, "A nurse always has a duty to his/her clients/patients to assure that they are safe. One of the most important actions a nurse can take toward that goal is making sure that he/she only accepts those assignments for which the nurse has the education, training, and skill competency. Physical and emotional ability can also impact a nurse's ability to maintain client safety when accepting an assignment."

It is my opinion, with a reasonable degree of nursing certainty that the care rendered to Christian Marente by Epic Home Service, Inc., and Nurse Asah did not meet the applicable nursing Standard of Care. It is my opinion Nurse Asah should have:

1.  Not have attempted to change the trach of Christian; a procedure that was not her responsibility.

2.  Immediately called Emergency personnel for additional help when she could not re-insert the trach.

3.  Immediately identify herself as a Registered Nurse qualifications to the appropriate authorities to avoid unnecessary delay in additional assistance.

4.  Maintain a composed, professional conduct while under an emergency situation.

5.  Follow the American Heart Association's guidelines for Cardio-pulmonary resuscitation.

MARENTE 08/20/13                          PAGE 6



6.    Instituted appropriate nursing interventions that required stabilization in a patient's condition.

7.    Been properly trained in the care of a tracheostomy patient and in how to properly act in an emergency situation.

## THE STANDARD OF CARE APPLICABLE TO EPIC HEALTH SERVICES, INC.

It is my opinion that based on my experience as a registered nurse and supervising nurse with duties to determine the treatment standards to be used by nurses under my responsibility that the applicable standard of care for Epic Health Services, Inc., are the treatment standards to be applied are to ensure that all patients receive appropriate care regardless of the setting and to only assign nurses to patients that meet those standards. Those standards of care include:

1.    To ensure that nurses are properly trained to provide basic nursing services;

2.    To ensure that nurses are properly informed to know the limitations of their assigned duties and responsibilities to assigned patients;

3.    To properly instruct assigned nurses not to undertake nursing/medical procedures that are not the nurses assigned duties and responsibilities;

4.    To ensure that assigned nurses have the appropriate communication skills, particularly in an emergency situation; and

5.    To ensure that assigned nurses have the proper training and experience to remain calm and collected in an emergency situation.

## BREACHES OF THE STANDARD OF CARE BY EPIC HEALTH SERVICES, INC.

It is my opinion that on September 10, 2012 that Epic Health Services, Inc., breached the applicable standards of care for a medical provider of nursing services by assignment of Nurse Asah to provide nursing services to Christian Marente as follows: Epic Health Services, Inc., failed:

1.    To ensure that Nurse Asah was properly trained to provide basic nursing services;

2.    To ensure that Nurse Asah was properly informed to know the limitations of her assigned duties and responsibilities to Christian Marente;

3.    To properly instruct Nurse Asah not to undertake nursing/medical procedures that are not her assigned duties and responsibilities;

4.    To ensure that Nurse Asah had the appropriate communication skills, particularly in an emergency situation; and

5.    To ensure that Nurse Asah had the proper training and experience to remain calm and

MARENTE 08/20/13             PAGE 7

 

collected in an emergency situation.

My opinions are based on the information I have reviewed thus far and I reserve the right to change, supplement or amend that opinion if further information becomes available.

Respectfully,

Patti Bingham, RN

> Vernon's Texas Statutes and Codes Annotated
>   Civil Practice and Remedies Code (Refs & Annos)
>     Title 4. Liability in Tort
>       Chapter 74. Medical Liability (Refs & Annos)
>         Subchapter I. Expert Witnesses (Refs & Annos)

V.T.C.A., Civil Practice & Remedies Code § 74.402

§ 74.402. Qualifications of Expert Witness in Suit Against Health Care Provider

Effective: September 1, 2003
Currentness

(a) For purposes of this section, "practicing health care" includes:

(1) training health care providers in the same field as the defendant health care provider at an accredited educational institution; or

(2) serving as a consulting health care provider and being licensed, certified, or registered in the same field as the defendant health care provider.

(b) In a suit involving a health care liability claim against a health care provider, a person may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care only if the person:

(1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;

(2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

(c) In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness:

(1) is certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim; and

(2) is actively practicing health care in rendering health care services relevant to the claim.

(d) The court shall apply the criteria specified in Subsections (a), (b), and (c) in determining whether an expert is qualified to offer expert testimony on the issue of whether the defendant health care provider departed from accepted standards of health care but may depart from those criteria if, under the circumstances, the court determines that there is good reason to admit the expert's testimony. The court shall state on the record the reason for admitting the testimony if the court departs from the criteria.

(e) This section does not prevent a health care provider who is a defendant, or an employee of the defendant health care provider, from qualifying as an expert.

(f) A pretrial objection to the qualifications of a witness under this section must be made not later than the later of the 21st day after the date the objecting party receives a copy of the witness's curriculum vitae or the 21st day after the date of the witness's deposition. If circumstances arise after the date on which the objection must be made that could not have been reasonably anticipated by a party before that date and that the party believes in good faith provide a basis for an objection to a witness's qualifications, and if an objection was not made previously, this subsection does not prevent the party from making an objection as soon as practicable under the circumstances. The court shall conduct a hearing to determine whether the witness is qualified as soon as practicable after the filing of an objection and, if possible, before trial. If the objecting party is unable to object in time for the hearing to be conducted before the trial, the hearing shall be conducted outside the presence of the jury. This subsection does not prevent a party from examining or cross-examining a witness at trial about the witness's qualifications.

**Credits**
Added by Acts 2003, 78th Leg., ch. 204, § 10.01, eff. Sept. 1, 2003.

Notes of Decisions (82)

V. T. C. A., Civil Practice & Remedies Code § 74.402, TX CIV PRAC & REM § 74.402
Current through the end of the 2015 Regular Session of the 84th Legislature

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.